UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>        Plaintiff,<br><br>  vs.<br><br>BENEFYTT TECHNOLOGIES, INC., f/k/a HEALTH INSURANCE INNOVATIONS, INC.;<br><br>HEALTH PLAN INTERMEDIARIES HOLDINGS, LLC;<br><br>HEALTHPOCKET, INC. d/b/a AGILEHEALTHINSURANCE;<br><br>GAVIN D. SOUTHWELL, individually and as a former officer, director, and manager of Benefytt Technologies, Inc., Health Plan Intermediaries Holdings, LLC, and HealthPocket, Inc.; and<br><br>AMY E. BRADY, individually and as a former vice president and manager of Benefytt Technologies, Inc. and Health Plan Intermediaries Holdings, LLC,<br><br>        Defendants. | Case No. __22-cv-1794__<br><br>**COMPLAINT FOR PERMANENT INJUNCTION, MONETARY RELIEF, AND OTHER RELIEF** |

Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint alleges:

1.　　The FTC brings this action under Sections 13(b) and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b), 57b, the Telemarketing and Consumer Fraud and Abuse Act ("Telemarketing Act"), 15 U.S.C. §§ 6101-

6108, and Section 5 of the Restore Online Shoppers' Confidence Act ("ROSCA"),

15 U.S.C. § 8404, which authorize the FTC to seek, and the Court to order,

permanent injunctive relief, monetary relief, and other relief for Defendants' acts

or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and in

violation of the FTC's Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310, as

amended, and Section 4 of ROSCA, 15 U.S.C. § 8403.

## <u>SUMMARY OF THE CASE</u>

2.     For many years, Defendants have deceived consumers seeking health

insurance into buying products and services that do not provide the coverage

Defendants have promised.  Defendants and their vast network of sales and

marketing partners have relied heavily on the Patient Protection and Affordable

Care Act ("ACA") to generate interest in their products.  Benefytt and its agents

then misrepresent the features of those products during their sales pitch, falsely

indicating to consumers that their products are actually ACA-qualified plans, or

provide coverage equivalent to comprehensive, ACA-qualified plans at a lower

cost.  To make matters worse, Defendants have also often added fees for costly

items consumers do not want or agree to purchase, and continued to bill consumers

for products after they request cancellation.

3.     Many consumers learn the truth about Benefytt's products only when

they need the benefits Defendants promised.  In some instances, for example,

consumers try to schedule an appointment with a doctor or fill a prescription, only to find that the products Defendants sold them provide little or no coverage whatsoever.  In other instances, consumers may incur hundreds or thousands of dollars in medical costs with the assumption they will be covered, only to later learn that the products they purchased from Defendants do not cover most or all of those costs.

4.    All told, Defendants have cheated consumers out of hundreds of millions of dollars through the deceptive and unfair sale of their products.  They have profited considerably from their misconduct, while consumers have suffered and continue to suffer substantial injury.

## JURISDICTION AND VENUE

5.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345.

6.    Venue is proper in this district under 28 U.S.C. § 1391(b)(1)-(3), (c)(1)-(2), and (d), and 15 U.S.C. § 53(b).

## PLAINTIFF

7.    The FTC is an independent agency of the United States Government created by the FTC Act, which authorizes the FTC to commence this district court civil action by its own attorneys.  15 U.S.C. §§ 41-58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or

practices in or affecting commerce.  The FTC also enforces the Telemarketing Act,

15 U.S.C. §§ 6101-6108, as amended.  Pursuant to the Telemarketing Act, the FTC

promulgated and enforces the TSR, 16 C.F.R. Part 310, as amended, which

prohibits deceptive and abusive telemarketing acts or practices.  The FTC also

enforces ROSCA, 15 U.S.C. §§ 8401 *et seq.*, which prohibits certain methods of

negative option marketing on the Internet.

## DEFENDANTS

### Corporate Defendants

8.     Benefytt Technologies, Inc., formerly known as Health Insurance

Innovations, Inc., is a Delaware corporation with its principal place of business at

3450 Buschwood Dr., Suite 200, Tampa, Florida 33618.  In August 2020, entities

affiliated with Madison Dearborn Partners, LLC, a Delaware private equity

company based in Chicago, Illinois, acquired Benefytt Technologies, Inc. and its

subsidiaries.  Madison Dearborn Partners maintains a controlling interest in

Benefytt Technologies, Inc., which transacts or has transacted business in this

district and throughout the United States.  Benefytt Technologies, Inc. wholly

owns Defendant Health Plan Intermediaries Holdings, LLC, as well as the various

indirect subsidiary operating companies owned by Defendant Health Plan

Intermediaries Holdings, LLC, including HealthPocket, Inc., which also does

business as AgileHealthInsurance.  Benefytt Technologies, Inc. has done business

as Health Plan Intermediaries Holdings, LLC, Health Insurance Innovations, Inc.,

HealthPocket, Inc., and AgileHealthInsurance, among other names.  At all times

relevant to this Complaint, acting alone or in concert with others, Benefytt

Technologies, Inc. has advertised, marketed, distributed, or sold association

memberships and healthcare-related products to consumers throughout the United

States.

9.      Health Plan Intermediaries Holdings, LLC ("HPIH"), also doing

business as Benefytt, and formerly doing business as Health Insurance Innovations,

is a Delaware limited liability company with its principal place of business at 3450

Buschwood Dr., Suite 201, Tampa, Florida 33618.  HPIH wholly owns various

operating companies, including Defendant HealthPocket, Inc., which also does

business as AgileHealthInsurance.  HPIH transacts or has transacted business in

this district and throughout the United States.  At all times relevant to this

Complaint, acting alone or in concert with others, HPIH has advertised, marketed,

distributed, or sold association memberships and healthcare-related products to

consumers throughout the United States.

10.      HealthPocket, Inc., d/b/a AgileHealthInsurance, is a Delaware

corporation with its principal place of business at 15438 N. Florida Avenue, Suite

201, Tampa, Florida 33613. HealthPocket, Inc. transacts or has transacted business

in this district and throughout the United States.  At all times relevant to this

5

Complaint, acting alone or in concert with others, HealthPocket, Inc. has advertised, marketed, distributed, or sold association memberships and healthcare-related products to consumers throughout the United States. Benefytt Technologies, Inc., Health Plan Intermediaries Holdings, LLC, and HealthPocket, Inc. are referred to collectively herein as "Benefytt" or the "Corporate Defendants."

### Individual Defendants

11.     Defendant Gavin D. Southwell joined Benefytt as a consultant in early 2016, and the company's then-CEO tasked him with coordinating the company's "compliance challenges" and "broader strategy" shortly thereafter. Prior to joining Benefytt, Southwell held multiple leadership positions in compliance and risk management. He served as Chief Risk Officer and then Chief Operations Officer for a large independent global wholesale and reinsurance brokerage. Before that, he worked as a risk manager and served as Chief Risk Officer at another insurance-related company. Southwell was named Benefytt's President in July 2016, at which point he assumed responsibility for overseeing Benefytt's sales and compliance departments. He added the title of CEO in November 2016. Southwell thereafter served as an officer or director of all three Corporate Defendants until he separated from the companies in approximately August 2021. Acting alone or in concert with others, he formulated, directed, controlled, had the

authority to control, or participated in the acts and practices set forth in this Complaint.  For example, Southwell managed the Corporate Defendants' operations, served as a corporate officer, and supervised and directed senior executives in sales and compliance roles.  He corresponded with these senior executives and the Corporate Defendants' business partners about the sale of Defendants' products on a regular basis.  Southwell described his importance to Benefytt in a June 2018 email to another member of Benefytt's Board of Directors as follows: "[e]very investor, every carrier, every distributor, every initiative [Benefytt has] done has been because of me.  All the ideas are mine."  In his central role at Benefytt, Southwell often was included in internal and external correspondence regarding compliance issues, such as consumer complaints and reports about particularly problematic distributors.  On numerous occasions, Benefytt employees and others presented Southwell with concerning information regarding sales agents' deceptive, unfair, and abusive marketing and sales practices.  Although such issues were repeatedly brought to Southwell's attention, he did not meaningfully address them, and instead furthered the misconduct as set forth in more detail below.

12.    Defendant Amy E. Brady served as a Benefytt vice president and manager until approximately July 2021.  Acting alone or in concert with others, she formulated, directed, controlled, had the authority to control, or participated in

7

the acts and practices set forth in this Complaint.  For example, as a senior sales executive, Brady supervised and directed agents responsible for selling Defendants' products.  Brady routinely received reports regarding Defendants' marketing and sales practices, including consumer complaints and audits.  Brady personally reviewed Benefytt agents' deceptive sales scripts.  On numerous occasions, Benefytt employees and others presented Brady with concerning information regarding sales agents' deceptive, unfair, and abusive marketing and sales practices.  Although such issues were repeatedly brought to Brady's attention, she did not meaningfully address them, and instead furthered the misconduct as set forth in more detail below.

### Common Enterprise

13.    The Corporate Defendants have operated as a common enterprise while engaging in the deceptive and unfair acts and practices and other violations of law alleged below.  The Corporate Defendants have conducted the business practices described below through interrelated companies, which have common ownership, officers, managers, and business functions.  Benefytt Technologies and HPIH primarily operate out of the same location, hold themselves out as Benefytt, and have held themselves out as Health Insurance Innovations.  Because these companies have operated as a common enterprise, each of them is liable for the acts and practices alleged below.

8

## COMMERCE

14.     At all times relevant to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' BUSINESS PRACTICES

### Background

15.     Benefytt works with insurance carriers and vendors to develop, sell, and support association memberships and products that may be purchased with those memberships.  Benefytt employs sales agents and contracts with third parties to offer an assortment of non-traditional health insurance plans, as well as medical discount programs, telemedicine services, and other items.  Consumers may purchase Benefytt's products online and by phone from a vast network of sales agents.  Defendants have referred to the hundreds of third-party companies that have employed these agents as their "distributors."

16.     Defendants have regularly misrepresented the characteristics and benefits of the products and services they sell.  Tens of thousands of consumers have complained to Defendants about these deceptive practices, and Defendants have received thousands of similar complaints from state regulators, the Better Business Bureau, and private attorneys.  Numerous current and former employees and business partners have raised concerns about these practices and presented

Defendants with compelling evidence of their misconduct.  Rather than working to ensure that they are not misleading consumers—including by promptly terminating agents and distributors who misrepresent their products and services—Defendants have furthered the misconduct.

17.     In October 2018, the FTC sued one of Benefytt's largest third-party distributors, Simple Health Plans LLC ("Simple Health") and related companies, as well as Simple Health's President and Chief Executive Officer Steven Dorfman ("Dorfman").  *See FTC v. Simple Health Plans LLC et al.*, 18-cv-62593-DPG (S.D. Fla.).  The FTC alleged that Simple Health claimed to offer consumers comprehensive health insurance or its equivalent, but instead typically enrolled consumers in an assortment of lesser programs, including Defendants' limited benefit plans and medical discount memberships.  In addition to the significant monthly fees they paid for Defendants' products, many Simple Health customers incurred substantial medical expenses under the mistaken belief that these expenses would be covered by the comprehensive health insurance they thought they had obtained from Simple Health.

18.     On May 14, 2019, the court granted the FTC's motion for a preliminary injunction, finding it likely that the FTC would prevail on its claims against Simple Health and Dorfman.  Specifically, the Court found that the record supported a finding that Simple Health "made a series of material

misrepresentations that were likely to influence consumers' decisions to purchase" various health-related products, several of which Simple Health sold on Benefytt's behalf.

19.     For years prior to the FTC's lawsuit against Simple Health, Defendants were aware of and enabled the distributor's misconduct.  During that time, Defendants knew that thousands of consumers seeking health insurance were being harmed by Simple Health's fraudulent sales practices.  Despite compelling evidence of ongoing fraud, Defendants continued to invest heavily in their relationship with Simple Health, ultimately collecting hundreds of millions of dollars from Simple Health customers and paying substantial commissions and bonuses on the distributor's sales.  Simple Health is just one example of a distributor that regularly engaged in deceptive practices when marketing Defendants' products.

**Defendants' Products**

20.     Comprehensive health insurance, sometimes referred to as "major medical" insurance, traditionally involves an agreement between an insurance company and a consumer under which the company agrees to pay a substantial portion of the healthcare expenses the consumer may incur in exchange for the consumer's payment of premiums and a deductible.  The ACA sets standards for certain comprehensive health insurance plans.  A "Qualified Health Plan" under

the ACA must cover people with pre-existing conditions without charging more for the insurance plan, and must provide ten enumerated essential health benefits, including coverage for prescription drugs and preventive care. Qualified Health Plans also conform to established limits on out-of-pocket expenses, like deductibles, copayments, and coinsurance. The term "coinsurance" refers to the percentage of the cost the policyholder is responsible for paying after any applicable deductible. For example, under a health insurance plan with thirty percent coinsurance (i.e., a "70/30" plan), the policyholder pays thirty percent of the cost of covered medical treatment, and the insurance company pays seventy percent.

21. Benefytt develops, sells, and supports association memberships, which are not insurance. Instead, these memberships provide access to varied services, from health-related benefits, such as medical discount or health concierge programs, to unrelated items like identity protection and "specialty dining" opportunities on cruises. Benefytt's association memberships also often include the option to purchase either a short-term medical or limited benefit plan. Benefytt and its agents frequently focus on and emphasize the supposed benefits of these short-term medical and limited benefit plans in their sales pitch to consumers, and often refer to these plans as their "core" products.

22.    In contrast to the standard 12-month "plan year" or "policy year" for comprehensive health insurance, many short-term medical plans (also referred to as "short-term, limited duration insurance," or "STLDI" plans) last for only a period of months.  These plans are not required to provide all of the ten essential health benefits of Qualified Health Plans, like emergency services and preventive care.  There is no universal prohibition on dollar caps on coverage for services or out-of-pocket expenses for short-term plans, and such plans generally do not cover treatment for pre-existing conditions.  If a short-term plan covers prescriptions at all, there often are restrictions, such as exclusions for outpatient drugs or general dollar caps.

23.    Limited benefit plans (also referred to as "health benefit," "limited medical," and "limited benefit indemnity" plans) provide non-comprehensive cash benefits capped at a specific amount for a specific service, treatment, condition, or disease.  For example, a limited benefit plan might provide for a $50 cash payment to the consumer after a doctor visit, but the consumer would then be responsible for any remaining costs charged for the visit, regardless of the amount.  The benefits of these plans often are capped both by the type of service and annually.  In other words, a plan member might only be entitled to a $50 cash payment for each of three doctor visits per year, or a total of $150 annually for that service.  All other charges for those three doctor visits and any others that year would be the

consumer's responsibility.  To the extent that a limited benefit plan pays any

benefits relating to pre-existing conditions (e.g., a doctor visit related to an existing

health problem), such plans often incorporate at least a 30-day waiting period

before any benefits would be available.

24.    In addition to the "core" products, Defendants also have sold and

supported several products and services they have described as "supplemental" or

"ancillary," including life and accident insurance, vision and dental discount plans,

telemedicine, and fitness programs that feature exercise routines and daily health

tips.  The various products and services Defendants have sold and supported are

referred to collectively hereafter as "Benefytt Products."  Defendants have sold and

billed for many of their core and ancillary Benefytt Products with a negative option

in which the consumer continues to pay a monthly fee to continue to receive the

Benefytt Product unless they cancel.

25.    Third parties underwrite the insurance products that Benefytt sells and

supports.  Corporate Defendants are not insurers or insurance carriers, and they do

not provide insurance coverage or assume any underwriting, insurance, or

reimbursement risk in connection with any Benefytt Product.  Benefytt also does

not process, adjudicate, or pay insurance claims.

## Defendants' Distribution Network

26.     Defendants have operated a web-based technology platform, through which they have facilitated sales, billing, payment, compliance, and internal customer service functions related to Benefytt Products.

27.     Defendants have sold Benefytt Products through two channels, one internal and one external.  Benefytt's internal distribution network has consisted of Benefytt-owned websites, such as www.healthpocket.com, which is operated by Defendant HealthPocket, Inc., a Benefytt subsidiary.  Benefytt also owns and operates call centers staffed by agents and managers employed by Benefytt or its subsidiaries.  Benefytt's second and larger sales channel has been an external distribution network, which consists of thousands of sales agents whom Defendants have recruited and trained to sell Benefytt Products by phone and via their own agencies' websites.  Both internal and external agents have used the Benefytt platform to sell Benefytt Products, and Benefytt controls agents' access to the platform and to Benefytt Products.

28.     Defendants generally have charged consumers a fee to obtain an association membership, and then an additional fee for each Benefytt Product purchased with the membership.  Benefytt keeps a portion of those fees, sometimes as much as thirty percent.  It uses the remainder to pay a commission to the sales

agent and product-related fees to the carriers, discount plan vendors, and service providers.

29.    Benefytt pays sales agents commissions amounting to as much as forty percent of the total amount paid by consumers.  In some circumstances, Benefytt also advances operating capital to distributors, which is secured by future commissions.  Benefytt also pays distributors bonuses for hitting performance and compliance targets that Defendants establish.

## Defendants Misrepresent Their Products

### *Defendants' Deceptive Online Lead Generation*

30.    Defendants and their agents have preyed upon consumers looking for health insurance online by referencing the ACA and "Obamacare" in their marketing materials in order to generate interest in non-ACA, Benefytt Products. Benefytt and its distributors own some of the marketing or lead generation websites that generate interest in Benefytt Products.  Defendants also have paid millions of dollars for consumer contact information or live call transfers ("leads") generated by third-party sites.  Consumers can find lead generation websites by conducting Internet searches for health insurance.

31.    Some of the lead generation websites Defendants and their distributors have used specifically refer to the ACA or use terms associated with the ACA, such as "Obamacare."  These sites suggest to consumers that they will

receive information about comprehensive health insurance plans, including

Qualified Health Plans under the ACA, after they input certain personal contact

information.

32.    For example, the Corporate Defendants own and operate the website

www.healthpocket.com, which Defendants have touted as "the easiest way to find

health insurance" by providing "consumers with access to health insurance

information search and comparison technology."  Defendants have claimed that

consumers can search for, compare, and "apply" for Qualified Health Plans, as

well as other products, via www.healthpocket.com.

33.    When consumers land at www.healthpocket.com, Defendants have

invited them to search for "the right health plan for you," including Qualified

Health Plans under the ACA, as shown in the following screen shot of the

www.healthpocket.com website:



**Image A (HealthPocket)**
*www.healthpocket.com*

34.    Consumers who choose to seek out more information about ACA

plans on www.healthpocket.com must enter their location, and they are taken to a

list of ACA plans in their area that includes approximate cost and deductibles,

amongst other information, as shown in the following example:



**Image B (HealthPocket)**
*www.healthpocket.com*

35.    When consumers select a plan from the list, the

www.healthpocket.com website displays a page about the selection, along with a

button indicating the consumer may "Apply Now":



**Image C (HealthPocket)**
*www.healthpocket.com*

36.    But there is no way to "apply now"—or apply at all—for any

Qualified Health Plan directly on www.healthpocket.com.  For example, when

consumers have tried to apply for an ACA plan on www.healthpocket.com during

open enrollment, the site has reported that the plan was "not available from

[Defendants'] current partners" and provided links to search for non-ACA Benefytt

Products instead.  In other instances during ACA open enrollment, consumers were

presented with information about "How to Apply" for their selected ACA plan, as

in the image that follows, which notes but does not link to the federal www.healthcare.gov website.  The page also presents a telephone number purportedly associated with a "customer service representative [who] can help [the consumer] review [his or her] options, complete [an] application and enroll in coverage," which connected consumers to one of Defendants' call centers that typically do not sell ACA plans.



**Image D (HealthPocket)**
*www.healthpocket.com*

37.    When consumers have visited www.healthpocket.com outside of the ACA open enrollment period and sought to "Apply Now" for a particular Qualified Health Plan, Defendants have directed them to a page indicating that the "ACA

Open Enrollment Period has ended," and the selected "plan is no longer available for general enrollment."  These consumers, too, have been directed to the same phone number for Defendants' call center to "review [their] options" and "complete [their] application."

38.    Thus, both during and outside ACA open enrollment periods, Defendants have encouraged consumers to search and apply for plans on the www.healthpocket.com website in order to solicit leads for non-ACA products, and ultimately to generate sales of non-ACA Benefytt Products.

39.    In addition to the leads deceptively generated through www.healthpocket.com, Defendants have collaborated with their network of third-party distributors and marketing affiliates to generate leads for Benefytt Products. For example, Benefytt formed and funded a joint lead generation venture with Steven Dorfman called "Simple Insurance Leads," or "SIL."  As alleged in the FTC's complaint against Simple Health, Dorfman and SIL used various lead generation websites that deceptively employed the ACA and terms like "TrumpCare" to generate leads for the sale of non-ACA Benefytt Products.

40.    Defendants and their distributors also have spent millions of dollars purchasing hundreds of thousands of leads from third parties.  Like www.healthpocket.com, third-party lead generation websites used by Defendants claim to provide information about health insurance, including Qualified Health

Plans. In 2014, for example, a former Benefytt sales executive confirmed to Defendant Brady that "all lead vendors are leveraging Obamacare for their advertising[.]"

41.    The following site is just one example of a website that used the ACA to generate leads for non-ACA Benefytt Products:



**Image E (lead generation site)**
*www.obamacareplans.com*

42.    Defendants have known for years that their use of the ACA or "Obamacare" to generate leads for non-ACA, Benefytt Products has consistently confused consumers. In 2016, for example, a Benefytt compliance executive noted that Benefytt's "top issues across agencies" included "thought this was 'Obama

Care'!"  In 2018, moreover, a Benefytt sales manager questioned a top-selling

distributor's use of leads from www.obamacareplans.com and similar sites,

explaining in an internal email: "being on a site referencing ObamaCare is

concerning, when you enter in the information you are not directed to ACA plans

you are directed to [Defendants' limited benefit plans from certain well-known

major medical insurance plan carriers] which is very misleading!!"

43.     Defendants' distributors, agents, and lead generators also have used

the term "Trumpcare" to market Benefytt Products, despite Defendants' internal

acknowledgment that "Trumpcare does not exist as an insurance product" and that

using the term in marketing was "false & misleading[.]"  For example, Simple

Health and Dorfman operated the lead generation website

www.trumpcarequotes.com, which deceptively claimed to offer "Health Insurance

for Smart People" from "the Nation's Leading Carriers" at "Low Affordable

Premiums" with "Prescription Drug Coverage," and which touted false affiliations

with well-known major medical health insurance plan carriers.

44.     As described above, the FTC identified in its complaint against

Simple Health various lead generation sites the distributor used that deceptively

referenced comprehensive health insurance, the ACA, and "Trumpcare."  Those

allegations prompted one of Benefytt's senior managers responsible for

supervising sales agents to forward a related excerpt of the FTC's November 2,

2018 press release announcing the Simple Health complaint to another Benefytt manager later the same day with the following note: "This scares me a bit…. The lead guys we buy from use some of these similar practices."  Defendants and their distributors nonetheless continued to use deceptively generated leads to market and sell Benefytt Products.

### *Defendants' Deceptive Sales Process*

45.     When consumers begin the process of purchasing a Benefytt Product, the lead generation material described above featuring the ACA and "Obamacare" is often front-of-mind.  Having first obtained their leads through these deceptive means, Defendants have compounded the deception by routinely misrepresenting material aspects of the Benefytt Products during the sales process.

46.     Although some purchases of Benefytt Products are made entirely online, most have taken place over the telephone.  Defendants' sales agents have engaged in both outbound and inbound telemarketing with potential customers. Benefytt's agents call or are connected to consumers who have submitted their information to a lead generator.  Consumers also may reach Benefytt's agents directly by calling numbers listed on Benefytt's and their distributors' websites.  In either case, consumers end up speaking with individuals who often identify themselves as licensed insurance agents.  Some of these representatives work for

Benefytt's own call centers, while others are with call centers operated by one of Benefytt's distributors.

47.     In these calls, Defendants' agents have frequently claimed that for a one-time charge that often exceeds $100 and monthly payments that often total hundreds of dollars, Benefytt can provide consumers with health insurance that is equivalent to or provides the benefits of a Qualified Health Plan.

48.     In some instances, distributors have explicitly claimed that the product they are selling is a Qualified Health Plan or "Obamacare" when it is not. In other instances, Defendants' agents have claimed that Benefytt Products are at least as good as Qualified Health Plans in all material respects, falsely representing to consumers that the Benefytt Products offer comparable coverage at a lower price.

49.     In doing so, Defendants' agents have often misrepresented the benefits of Benefytt Products, including by promising coverage for things like pre-existing medical conditions, prescription medications, hospitalization, lab work, and access to vast networks of primary care physicians, specialists, and other healthcare providers. All of these benefits are available, consumers are told, for a relatively low price. But that is often simply false. Although the price may sometimes be lower, the represented benefits often are not provided. For example, Defendants discovered during a call audit that the "number 1 agent" at one of Defendants' top-selling distributors was falsely promising coverage for "unlimited

doctor visits" and "70% repricing" on medical costs, as well as a "prescription drug card" that was actually just a discount program. They then caught the agent making the same misrepresentations months later, even though the issues had purportedly been addressed with the agent and he had been "retrained."

50. Defendants' agents have also used insurance terms of art in their sales pitches, such as "premiums" and "coverage." Simple Health agents also routinely used "70/30" coinsurance language associated with traditional, comprehensive insurance plans during their sales pitch for limited benefit plans. But these concepts and insurance terms often do not apply to the Benefytt Products that the agents are pitching to consumers.

51. Defendants' agents have often told consumers that a particular plan is a "PPO," is widely accepted by doctors in the consumers' geographical areas, or that virtually all, or the vast majority of, doctors in the country will accept it. When consumers look for a covered provider after purchasing the plan, however, they often discover that their doctor does not accept the plan, or that the available benefits and discounts are negligible.

52. In many instances, these types of misrepresentations come straight from written sales scripts. For example, scripts that Simple Health agents used for years claimed that the limited benefit plans the agents were pitching "don't discriminate against any . . . pre-existing conditions." But many such plans do not

cover treatments for pre-existing conditions at all, and the ones that do frequently incorporate waiting periods of a month or more before any benefits for pre-existing conditions are available. Simple Health sales scripts also included terms like "enrollment period" that apply to Qualified Health Plans under the ACA, but not to Benefytt Products. In 2016, after Simple Health agents generated a significant number of complaints about a particular wellness product, a Benefytt compliance executive confirmed in an email that Simple Health agents were regularly misrepresenting the product. He explained that the distributor's sales "script was written in such a way that it left people confused about what they bought – whether they thought it was ACA compliant health insurance or had an actual network, [the product's features] were misrep[resent]ed."

53.    Pervasive deceptive sales practices were not limited to Simple Health, and they extend throughout Benefytt's sales network. By way of illustration, in May 2019, seven months after the FTC sued Simple Health, Defendants received the following complaint about another top-selling distributor. A consumer reported that the sales agent had represented that treatments for pre-existing conditions would be covered under a limited medical plan, only to find after seeking medical treatment that was not true, leaving the consumer with approximately $7,000 in uncovered medical bills. Upon reviewing the consumer's complaint in July 2019, nearly nine months after the FTC sued Simple Health, a

Benefytt customer service manager noted to a colleague the regularity of such complaints, explaining that she had "probably the most difficult job in our company. I strongly believe that. We know that we have the majority of our agents selling our products with so many different types of misrep[resentations]."

54. Defendants have also sold Benefytt Products to consumers directly online. Consumers might purchase Benefytt Products after following a link to a sales website featured on www.healthpocket.com, like those described and shown in the images above. Other consumers might be directed to Benefytt's and its distributors' sales websites after searching for terms associated with health insurance using common search engines.

55. After they have captured consumers' interest, often by employing the deceptive lead generation practices described above, Defendants have continued to present consumers with confusing and misleading information about Benefytt Products during the online sales process. For example, Defendants have continued to reference "Obamacare" and suggest false equivalence between Qualified Health Plans and Benefytt Products.

### *Defendants' Sham Verifications*

56. After misrepresenting the benefits of the Benefytt Products during the sales pitch, Benefytt then arranges for payment of both the enrollment fees and monthly recurring charges by asking for the consumers' debit or credit card

information.  Benefytt agents thereafter have asked consumers to "verify" their purchase orally or by electronic signature.  Consumers who choose electronic signature have been required to review and "e-sign" extensive disclosures on their devices prior to completing "verification."  On mobile devices, these disclosures can present as pages of small, barely legible text.  In many instances, the written disclosures conflict with what the agent told the consumer about the Benefytt Products.

57.     If the consumer opts for oral "verification" on a sales call, the agent typically transfers the consumer to a colleague, who asks consumers to confirm a series of complex, lengthy statements while being recorded.  Before the transfer, Benefytt agents have often instructed consumers to disregard any statements made during the "verification" portion of the call that conflict with the sales pitch.  Sales agents have also cautioned consumers not to ask any questions during the recorded "verification"—purportedly to avoid wasting limited recording space, or because a question would require the "verification" agent to transfer the call back to the sales agent, where the entire, lengthy sales process would begin again.  As a result, many consumers will complete the "verification" process even if the statements made during the process conflict with representations made by the sales agent, or the consumer disagrees with or does not understand the "verification" statements.

58.    In other instances, rather than telling consumers to disregard disclosures, Defendants' agents have omitted them entirely.  For example, an internal review of ten "verification" calls from one distributor revealed that at least eight of the agents did not explain that consumers' purchases included charges for separate ancillary products.  Two agents omitted disclosures regarding exclusions for pre-existing conditions, and another agent failed to inform the consumer that the plan did not meet the ACA's minimum essential coverage requirements.

59.    Defendants' agents also have provided inaccurate information or lied to consumers about Benefytt Products in order to obtain "verifications."  For example, Defendants received and reviewed one customer service call recording in which a consumer asked to cancel billing for an ancillary product that he did not want.  The agent falsely told the consumer that the ancillary plan in question was "complimentary," and that the consumer's total monthly bill would not change if he cancelled the ancillary plan.  The agent then recorded a purported "verification" statement by the consumer that he wished to keep and not cancel the ancillary plan, which was based on the misinformed belief that there was no additional charge for it.

60.    Due to Defendants' deceptive lead generation and sales practices, many consumers have entered the "verification" process believing they are purchasing comprehensive health insurance that is equivalent to a Qualified Health

Plan.  These consumers believe that they will have immediate, comprehensive

insurance coverage for pre-existing conditions, surgery, prescription medications,

and other treatments when they do not.  Even after "verifying" their purchase,

many consumers still do not understand that they have purchased something less

than comprehensive health insurance, or its equivalent, or that they also are being

charged for a series of ancillary products, as explained below.

### *Defendants' Deceptive Bundling of Ancillary Products*

61.    In connection with marketing their "core" short-term medical and

limited benefit plans, Defendants also have bundled and charged consumers for

various ancillary products, including association dues, life and accident insurance,

telemedicine, and fitness programs, as well as prescription, vision, and dental

discount plans.  In many instances, Defendants have not clearly disclosed as part of

the sales pitch that the ancillary products are separate products with separate

monthly fees.  Based on the way Defendants and their distributors have presented

the ancillary products, consumers often are not aware that they are purchasing

these additional products at all.

62.    Consumers' confusion about the ancillary products flows directly

from that misleading sales pitch.  For example, on phone sales, Defendants' agents

have often mentioned ancillary products only briefly as part of a lengthy, high-

pressure call focused mainly on the core products.  The lines between the core and

ancillary products often are blurred, with sales agents discussing the potential monetary benefits of an ancillary product like accident insurance at the same time they are describing the benefits of whatever health insurance product and association membership the agent is pitching.

63.     Defendants have also indicated to Internet purchasers that ancillary products are "included" with the purchase of another item, such as a limited benefit plan.  But those ancillaries are separate products with separate fees.  When Defendants have identified separate ancillary items and their separate fees, they often have buried the information in obscure sections of the online purchase page or near conflicting claims that make it unlikely that consumers will see it—let alone understand that once they purchase one of Benefytt's core products, Benefytt will begin charging them for separate, unrelated products.

64.     In the following example from the Corporate Defendants' www.agilehealthinsurance.com site, Defendants offered a short-term medical plan for "$42.52 per month."  The word "fees" appears in a significantly smaller and lighter font next to the purported monthly cost.



**Image F (short-term medical plan advertisement)**
*www.agilehealthinsurance.com*

65.    When consumers click the bright yellow "Select" button underneath the price, they are led to a page with a "Policy Summary" that includes the "Monthly Base Premium" of $42.52, as well as an additional $19.99 for "Association Dues" and $9.95 for "Telemedicine Benefits," both of which the consumer never selected and cannot be declined.  As a result, the plan actually costs nearly $30 more per month, or seventy percent above the advertised price. Indeed, Benefytt's "Policy Summary" descriptor is itself misleading, because the "Telemedicine Benefits" listed below it do not derive from the core product the consumer selected; the benefits actually come from a separate product that Benefytt included at an additional cost, without consumers' knowledge or consent.



**Image G (sample "Policy Summary" for short-term medical plan)**
*www.agilehealthinsurance.com*

66.     Benefytt's blurring of charges for core and ancillary products has

continued after the initial sale—during one earnings call, they touted that they

provide "one enrollment process" and "one bill.  So to the consumers it's like one

product."  True to their word, Defendants have exacerbated the deception by

employing "one bill"—that is, using techniques like single-line or grouped billing

on consumers' bank or credit card statements that serve to conceal the separate

charges for Benefytt's core and ancillary products.  In their "welcome"

correspondence to new customers, Defendants also have bundled the fees for

various items and showed them as a single charge for "insurance," again

concealing that consumers are charged separate fees for core and ancillary

products.  In one instance, that type of "welcome" correspondence prompted

questions from both a state regulator and a carrier partner, which noted the

discrepancy between the stated charge for "insurance" in Defendants' "welcome"
correspondence and the actual, lower monthly charge for the limited benefit
insurance plan that the consumer had purchased with an association membership.
In reaction to such confusion, Defendants decided to stop providing cost
information in their "welcome" correspondence altogether, rather than to break out
the fees that Defendants were charging for their core and ancillary products and
clarify those important details for the consumer.

67.     To make matters worse, Defendants have often failed to cancel the
ancillary products when consumers call to cancel the core plan.  As a result,
Defendants have continued to bill these consumers for the ancillary products even
after the core product has been canceled.

68.     Because many consumers do not know Defendants enrolled them in
separate "ancillary" products, they do not expect to continue to be charged for
anything else after canceling the core product.  A senior Benefytt executive
confirmed as much in an email to Simple Health's Chief Compliance Officer,
copying Defendant Brady: "As you know, members often do not even know that
they have multiple policies in force, they only know the bundled price that was
quoted to them during the sales process; as such, when they call to cancel, they are
expecting all policies and charges to stop."

35

69.     Defendants have received thousands of complaints indicating that consumers either did not authorize the separate charges for ancillary products in the first place or that they had canceled, only to find out later that Defendants were still billing them for ancillary products.  One consumer described his family's experience this way: "You successfully put me in medical insurance limbo while simultaneously scamming my own mother['] credit card.  What are you going to do to refund the recurrent 'addon' charges which were blatantly ripped out of her account? . . . [Benefytt] canceled this plan Sept. 3rd as I recall, and then you continuously billed for what were claimed as 'addons' to you[r] product. So please explain your justification for all this disguised stealing."

70.     In 2014, moreover, a third-party review of Benefytt's operations conducted on behalf of one of its insurance carrier partners recommended that the carrier should "further investigate any exposure related to the unfair sales practices through the use of bundling/tie-ins of non-insurance services alongside the [short-term medical] product."  Although that recommendation was shared with Benefytt, Defendants continued to bundle those products and received thousands more complaints from consumers about the practice.  Years after the third-party review, for example, a Benefytt compliance executive warned her colleagues that Simple Health was "NOT communicating the ancillary's [sic] properly.  People do not understand that they purchased these products."

36

71.    Defendants' practice of charging consumers for ancillary products without their consent has pervaded Benefytt's sales network, and goes well beyond sales made by Simple Health to those of other top distributors.  In an internal email describing complaints about one top-selling distributor, a Benefytt compliance executive noted, "ancillaries not authorized and misrep ALL over the place on many different benefits."  Similarly, the compliance executive reported to Defendant Brady that the "leading compliant [sic]" about a different top-selling distributor was not "communicating the ancillary policy effectively" or "properly." The same executive separately confirmed to Southwell, Brady, and others that "ALL" of Benefytt's distributors were generating complaints about ancillary products, and that consumers were reporting that they did not know they had purchased a product or that it was not cancelled upon request.  Another employee in Benefytt's compliance department separately confirmed to Defendant Brady that "[a]ncillary policy not authorized" was among the "top issues across agencies."

72.    Benefytt has sold hundreds of thousands of ancillary products to tens of thousands of consumers each year, and these sales have generated tens of millions of dollars in annual revenue.  Indeed, Benefytt has publicly touted that its "bundling technology" drove the share of revenue for ancillaries from one percent all the way to twenty-two percent.  In fact, as of 2014, Benefytt "sold three and a half ancillary products per core medical," something their chief executive had

"never heard . . . in the insurance industry before."  Defendant Southwell

confirmed in 2016 that ancillary sales were still outpacing core sales, and that

"being able to bundle [the products] together using [Defendants'] proprietary

technology" was "a real benefit to [their] business."

73.     Defendants long understood that they could resolve persistent issues

about their ancillary products by changing their sales, billing, and cancellation

practices, but repeatedly chose not to do so to maintain their revenues and profits

from those sales.  For example, an employee in Benefytt's customer service

department noted to a supervisor in 2016 that "one way [Defendants could] stop

chargebacks"—which occur when a charge is reversed after a consumer contests it

directly with their bank or credit card company—would be to terminate all

ancillary products when a core product was terminated.  The supervisor responded,

"Yep!"  The employee replied, "but we would lose to[o] much money doing that

(That would be their excuse)," and the supervisor responded, "exactly!"  In fact,

Benefytt employees have even been disciplined for bringing up ancillary policies

during calls with consumers about cancelling a "core" Benefytt Product.

### Defendants Authorize and Further Their Agents' Misconduct

74.     Defendants have authorized their third-party distributors and sales

agents to market and sell Benefytt Products, subject to Defendants' oversight.

Benefytt requires each third-party distributor to execute a contract, often referred

to as a "Managing General Agent Agreement," or "MGA Agreement," which sets the terms of their business relationship. Distributors have no right under the MGA to issue or circulate advertisements or literature about Benefytt Products without Benefytt's written approval, or to alter or substitute any product forms provided by Benefytt.

75.    Although the MGA Agreements indicate that each distributor is responsible for training its sales agents, Benefytt reserves the right to approve the distributors' recruitment, training, and supervision of sales agents. Benefytt offers product training for its internal and external sales agents via webinar, telephone, and on-site. The company also provides agents with access to an electronic repository of product and compliance training materials for review. Benefytt may terminate any distributor for fraud or for failing to follow and observe any of Benefytt's rules or regulations.

76.    Despite this authority, Defendants have allowed and encouraged their distributors to continue to market and sell Benefytt Products even when faced with substantial evidence of misconduct. As set forth below, Defendants have tacitly or explicitly approved of their agents' misconduct; have ignored overwhelming evidence of unlawful practices, including audit results, complaints, and other warnings; and have employed a "warm transfer" customer service system that has

made it difficult for consumers to cancel and helped distributors to retain

customers they had misled, often through further deception.

### *Defendants Approve of their Agents' Deceptive Sales Practices*

77.    Defendants have tacitly and explicitly sanctioned their distributors'

use of deceptive sales practices.  For example, Defendants repeatedly have been

confronted with evidence confirming the existence, and their agents' continued use

of, deceptive sales scripts.  Defendants occasionally reviewed copies of those

scripts themselves, and they received numerous complaints related to the specific

misrepresentations in those scripts, yet allowed the same agents to continue to sell

Benefytt Products.

78.    For years, Simple Health agents used scripts that included terms like

"coverage," and "open enrollment," which relate to comprehensive health

insurance and the ACA, not the Benefytt Products that Simple Health was pitching.

Simple Health scripts also incorporated concepts like 70/30 coinsurance and

deductibles when those terms and concepts did not apply to the products addressed

in the sales scripts.  Indeed, a Benefytt compliance executive acknowledged

internally as far back as early 2016, years before the FTC sued Simple Health, that

the company was resisting efforts to make its sales process compliant and to make

sales scripts less confusing and non-misleading.

79.    Benefytt allows its sales executives like Defendant Brady, who primarily are responsible for growing sales, to also serve as Benefytt's point person on compliance issues related to the third-party distributors they manage.  As a result, Defendant Brady played a prominent role in evaluating Simple Health's sales scripts, and she long knew of the deceptive and misleading statements that routinely appeared in those documents.

80.    For example, Brady reviewed and commented on Simple Health's sales script for a wellness product, which deceptively suggested that the discount plan was insurance and referred to the benefits of the plan as "coverage."  Brady also reviewed and commented on a longer version of Simple Health's sales scripting related to a limited benefit plan and various ancillary products, which featured numerous misleading statements about the "coverage" available under the purported "PPO" plan.  Despite Brady's awareness that Simple Health repeatedly employed deceptive sales scripting, she and the other Defendants failed to ensure that Simple Health agents actually stopped making deceptive and misleading statements like the ones in the scripts Brady reviewed.

81.    Not only did Brady fail to ensure that Simple Health stopped using deceptive scripts, she even attempted to help make the Simple Health scripts **less** clear and **more** confusing.  In April 2017, for example, she wrote to Dorfman at

Simple Health that she was trying to "shorten" and "bury" a scripted disclosure that a particular product was a limited benefit plan.

82.    The fact that Benefytt tasks its sales executives like Defendant Brady with both responsibility for growing the business and authority over script review and other compliance decisions means that distributor misconduct often continues unchecked.  Indeed, in a late 2016 email to Defendant Southwell, a Benefytt compliance executive indicated that Brady's repeated assurances that she was working directly with Simple Health to address certain deceptive and unfair sales practices was "becoming a daily joke."  Southwell nevertheless allowed Brady to continue to manage the relationship until the FTC sued Simple Health and the company ceased operating years later.

83.    During that time, Brady continued to undercut compliance processes, which enabled Simple Health to continue to deceive consumers.  In early 2017, for example, a senior Benefytt compliance executive complained to Defendant Brady that they still had "no eyes on how" Simple Health—Defendants' then-largest distributor for over a year—was selling Benefytt Products.  To attempt to address that issue, the compliance executive notified Dorfman that Benefytt would begin conducting additional in-person compliance and sales training meetings at Simple Health.  In response, Dorfman emailed Defendant Brady separately, stating: "Over my dead body LMAO."  Brady told Dorfman not to "worry," and that she would

"fix this."  Brady followed up with Dorfman again shortly thereafter, reassuring him that she had spoken to her compliance colleague and that Simple Health should not expect that Defendants would actually visit six times per year.  Brady told Dorfman: "We went from 6 to 4 [on-site compliance and training meetings] in 1 hour.  Let's get it down to 3!"

84.    Defendants also have refused to implement processes that they know would enable them to root out their agents' misconduct.  For example, Defendants long resisted collecting full sales call recordings because they did not want to confirm what the recordings would reveal and collect evidence of their agents' misconduct.  As Defendant Southwell explained in a letter to an insurance carrier partner that had suggested the recording of all sales calls, "some practical and legal issues . . . have always led [Benefytt] to reject the approach."  One such issue, according to Southwell, is that "if you collect the full sales call recordings . . . you will have in your possession data that could have shown for example, misrepresentation [sic], and that despite possessing the data, you failed to act upon it."

### Defendants Know of and Ratify their Agents' Misconduct

85.    Despite these efforts to shield their distributors' misconduct from detection, Defendants have collected substantial evidence showing that their distribution network routinely misrepresents key characteristics of Benefytt

Products.  Years ago, Benefytt developed a "Call Center Quality," or "CCQ,"

department, purportedly to "evaluate the interactions between" sales agents and

consumers.  CCQ representatives have reviewed and scored certain sales calls that

distributors occasionally provided to Defendants, and have also conducted or

reviewed third-party "secret shopper" calls, in which someone poses as a consumer

to assess the agent's sales practices.

86.    The CCQ sales call audits confirmed that sales agents throughout

Benefytt's distribution network routinely misrepresent the features of Benefytt

Products without meaningful consequence.  Under the scoring rubric Defendants

developed, sales agents receive points for making certain "non-negotiable"

disclosures (e.g., the name of their agency) and asking critical questions (e.g.,

whether the consumer has any pre-existing conditions).  Points are deducted when

an agent omits or misrepresents critical information (e.g., that the product is not a

Qualified Health Plan or that ancillaries are separate products and require separate

cancellation).

87.    Many agents receive low or negative overall scores on these CCQ

audits.  Representative CCQ audit scores include the following:

- An agent working for one of Benefytt's top-selling distributors
  received a score of "-49%" for a December 1, 2017 call after failing to

explain the products were not ACA qualified and failing to accurately describe the ancillary products, among other issues;

- Another agent working for the same agency received a "30%" for a September 24, 2019 call after "liken[ing] the product to major medical," failing "to explain how pre-existing conditions are handled," and "not mentioning the association" or its enrollment cost;

- An agent at another prominent distributor received a score of "-61%" for a December 8, 2017 call after failing to determine whether the consumer had any pre-existing conditions and to explain they would not be covered, inaccurately describing discounts, making a "misleading statement," and using other terminology associated with ACA plans; and

- An agent working for a third distributor received a score of "34%" for a June 25, 2018 call after stating that a Benefytt Product "was the same as employer coverage," and failing to explain that pre-existing conditions were not covered and that the plan would not qualify for tax exemption under the ACA.

88.   CCQ "secret shopper" audits likewise confirm routine misrepresentations made across Defendants' distribution network.  According to one such audit, the "number 1 agent" described above in Paragraph 49 "gave

45

inaccurate information right upfront" to consumers, which a Benefytt manager described as "a deceptive sales practice." The manager noted that it was not the first time Defendants caught the "number 1 agent" misleading a consumer: "All of these [misrepresentations] were addressed on the previous [secret shopper] call and have not been corrected."

89.    Benefytt's internal complaint data also confirms the breadth of the problem. For example, Defendants received thousands of consumer complaints about Simple Health, including **more than one thousand complaints over a period of several years connected to a single Simple Health agent**. Defendants knew that Simple Health often would process and report sales made by multiple people under a single licensed agent's name, making it difficult to assess whether a particular agent was actually personally responsible for the sales that led to the complaints, and therefore to identify and terminate bad agents.

90.    Defendant Brady privately cautioned Simple Health against the practice of reporting sales this way, but not because it made it more difficult for Defendants to audit their agents. Instead, she instructed Simple Health to "get the biz spread out!" and to ensure that "the biz [was] spread out to more agents," as part of "a process in keeping [Simple Health] safe when & if a [regulator] comes digging." Regardless, Defendants allowed numerous Simple Health agents with

highly problematic complaint records to continue to sell Benefytt Products until the FTC filed its enforcement action against the distributor.

91.    Benefytt executives at the highest levels, including Defendants Southwell and Brady, were aware of Simple Health's routine misconduct for years before the FTC sued Simple Health in late 2018.  In January 2016, a Benefytt compliance executive reported to Defendant Brady that it was "clear" based on consumer complaint data that there was "a serious issue" regarding how Simple Health and another distributor were marketing Defendants' wellness plan.  Months later, the compliance executive noted to a colleague responsible for customer service issues that it "should be no secret to [other Benefytt] execs" that Simple Health was responsible for nearly half of all the escalated complaints from the prior three months, and that the complaints were increasing.  Later in 2016, the same Benefytt customer service manager brought a consumer complaint to a Benefytt executive's attention, and noted that Benefytt received "literally hundreds of similar complaints/calls/escalations a month related to Simple, and they don't seem to be stopping."  The Benefytt manager went on: "In my experience people with significant medical conditions know exactly what questions to ask regarding potential coverage, and I'm confident this member would not have purchased had he not been misled."

92.     In May 2016, in an email exchange that was shared with Defendant Southwell the same day, the company's then-CEO and another senior executive agreed that Simple Health's and another distributor's compliance issues posed the "biggest risk" to Defendants.  In August 2016, after Southwell became Defendants' President, he emailed one of the same senior executives about Simple Health and the over $20 million in commissions that Benefytt had advanced to the distributor. In that message, Southwell claimed that Simple Health would need to meet unspecified "compliance requirements," but made clear that protecting the relationship with and the revenue generated by Defendants' largest distributor was more important to him than addressing its misconduct.  Setting out the goals of his proposal for Simple Health "in order of importance," Southwell explicitly prioritized "secur[ing] the business of [Defendants'] largest distributor and prevent[ing] a major impact on [Defendants'] income and earnings" over "ensur[ing Defendants'] distributors work within [Defendants'] compliance requirements."

93.     In notes he prepared in September 2016 for a Board of Directors meeting, Defendant Southwell confirmed his understanding that Benefytt's relationship with Simple Health was "at risk for . . . compliance items."  But he and the other Defendants let the distributor go on selling Benefytt Products for years thereafter without meaningful changes in behavior.  In light of Southwell's

48

willingness to "overlook[]" Simple Health's misconduct, Defendant Brady even

assured a Benefytt sales executive in an April 2018 text message that Defendants

would not terminate a different large distributor after its agents were found to be

deceptively describing Benefytt Products using terminology typically used for

ACA plans.  "U have the gavin [Southwell] protection on [the distributor]. U do

not need to worry," Brady messaged her colleague.  "Gavin isn't even friends with

Steve [Dorfman] & look at the stuff gavin overlooked last fall.  [The distributor]

just ha[s] to play the game for the next 2 months … like the rest of them all."

94.    Indeed, Simple Health was just one of several distributors that

Defendants have allowed to continue to sell Benefytt Products despite knowing of

serious misconduct.  In one instance, a business partner notified Defendants that a

Benefytt distributor employed "a dozen or more unlicensed" agents and had

"submitted a forged sworn statement" to a carrier in response to a consumer

complaint from a state regulator, along with "a variety of other misconduct."

Although Benefytt's business relationship with the distributor thereafter "fizzled,"

according to Defendant Brady, she later asked if Benefytt could begin working

with the distributor again.  Defendant Southwell responded with a "hard no from . .

. compliance," but also that he would "still like to get a win."  He suggested that

Brady should explore "strategically working" with one of Defendants' existing

large distributors to "manage" the non-compliant former distributor, ostensibly to

keep the smaller agency selling Benefytt Products at arm's length. The problematic former distributor did in fact start selling Benefytt Products again, and their agents continued to generate consumer complaints about their sales practices thereafter.

95.    The distributor that senior executives cited along with Simple Health as Benefytt's "biggest risk" also sold Benefytt Products for years despite evidence of widespread, persistent misconduct. For example, Benefytt caught one of the distributor's agents giving a consumer incorrect information and ignoring the consumer's statement about a significant pre-existing condition during the purported "verification" process. That "verification" call recording and other compliance issues prompted an internal discussion at Benefytt about terminating the distributor. Defendant Brady assured her colleague in compliance that the distributor would soon be switching to written "verifications," and Benefytt ultimately allowed the distributor to continue to sell Benefytt Products.

96.    Over a year later, however, during an audit of six of the distributor's sales calls, Defendants found that two agents similarly ignored consumers' reports of pre-existing conditions. Moreover, none of the agents on the six audited calls told consumers that the short-term health plan being pitched did not meet ACA minimum essential coverage requirements. Defendants also separately conducted a "secret shopper" call for the distributor around the same time, which revealed the

distributor's "top agent" making several misrepresentations and critical omissions. Despite these problems, Benefytt terminated the distributor only after the distributor became the subject of various state regulatory investigations and a **second** insurance carrier partner demanded that Defendants stop allowing the distributor to sell its plans.

97.     Similar decisions by their business partners have not always prompted Defendants to terminate problematic distributors, however.  An insurance carrier issued a cease and desist notice to Defendants and others regarding Simple Health in late 2017, following numerous complaints about Simple Health's sales of the carrier's limited benefit plans, and in light of other allegations the carrier had received regarding Simple Health's misconduct.  Rather than cease doing business with Simple Health, as the carrier had done, Defendants found another similar Benefytt Product for Simple Health agents to sell instead.

98.     A third-party insurance claims administrator also complained to Defendants about Simple Health in late 2017, explaining that it was "getting bombarded with calls from members advising they are being told the benefits [of limited benefit plans] pay 70/30," a misrepresentation by Simple Health agents that Defendants had flagged years earlier.  The claims administrator also noted that "incorrect information being given by Simple Health to members [was] getting out

of control." Defendants nevertheless allowed Simple Health to keep selling Benefytt Products.

99.    Rather than actually prevent the deceptive conduct or terminate the business relationship, Defendants invested in Simple Health's growth, and Benefytt ultimately paid the distributor over $187,000,000 million in commissions and performance bonuses. Benefytt also continued to pay Simple Health's legal fees related to at least one state regulatory investigation well into 2017. In January 2017, long after it was clear to Defendants that Simple Health was routinely misleading consumers, Defendants rewarded the distributor with a "compliance bonus." Not until the FTC sued Simple Health in 2018 and obtained a temporary restraining order putting the company out of business did Defendants finally terminate their relationship with the distributor.

### *Defendants' Agents Engage in Other Abusive Telemarketing Calls*

100.    Defendants' agents, distributors, and lead generators have in numerous instances called numbers listed on the National Do Not Call Registry and initiated outbound telephone calls that delivered a prerecorded message to pitch Benefytt Products, or to facilitate contact between a Benefytt sales agent and a consumer.

101.    Defendants have known their agents, distributors, and lead generators call consumers who have not consented to being contacted by the agent,

distributor, or lead generator, or to being called about purchasing Benefytt
Products.

102.   In numerous instances, Defendants' agents, distributors, and lead
generators have made telemarketing calls to consumers even though consumers did
not have a pre-existing business relationship with Defendants.

103.   Defendants are and have been aware of numerous complaints and
legal actions concerning their agents, distributors, and lead generators alleging: (i)
that they made outbound telephone calls that delivered prerecorded messages to
induce the sale of goods or services when the persons to whom these telephone
calls were made had not expressly agreed, in writing, to authorize the seller to
place prerecorded calls to such persons, and (ii) that they made improper calls to
numbers on the National Do Not Call Registry.

104.   Defendants nevertheless continued to do business with agents,
distributors, or lead generators that use such practices, and continued to benefit
from those practices.

### *Defendants Prevent Consumers from Canceling*

105.   Defendants have provided consumers who purchase Benefytt Products
with a customer service number so that consumers may seek Benefytt's assistance
on issues unrelated to insurance claims, such as billing and cancellation.  Thus,

Benefytt has received the initial call from many consumers seeking to cancel their

Benefytt Products.

106.    Years ago, Benefytt also provided consumers with the option to

cancel their purchases online by clicking a button within their profile on Benefytt's

platform.  However, Simple Health and Dorfman lodged repeated complaints with

Defendants about how many consumers were successfully canceling online via this

method.  In response, Defendants decided to make it impossible for all their

customers to cancel online, whether they purchased a Benefytt Product over the

Internet or by phone, and whether they purchased directly from Defendants or a

third party distributor like Simple Health.  Rather than continue to allow

consumers to click a button to cancel, they instead required consumers who

expressed an interest in canceling to call to speak to a customer service

representative in order to effectuate the cancellation and stop billing.  As a result,

in numerous instances, consumers who wished to cancel were forced to spend time

speaking with one or more of Defendants' agents tasked with "saving" the sale.

107.    Defendants even implemented what they call a "warm transfer"

program, pursuant to which Defendants have regularly transferred the calls of

consumers who seek to cancel their plans back to the distributor to enable the

distributor to "save" the sale.  Defendants' general policy has been to transfer

cancellation inquiries to the distributors unless consumers allege a

misrepresentation, in which case Defendants were supposed to handle the call themselves, so as not to send consumers back to the agency that allegedly deceived them.

108.    In practice, however, Defendants have allowed distributors to retain deceived consumers using the warm transfer program.  For example, Defendant Brady described Benefytt's rule for transferring cancellation calls to Simple Health this way: "If the customer just says 'I was lied to' or 'I was misrepped' we still transfer to [Simple Health].  IF the customer includes the comments 'do not transfer' or [is] screaming, crying, etc then the call won't transfer. The customer must show distress about being transferred to NOT be transferred."  As a result, in numerous instances, Defendants forced consumers who called to cancel due to misrepresentations in the original sales call to engage again with the same agency that had already lied to them about Benefytt Products.

109.    Defendants also were aware through their monitoring and scoring of warm transfer calls that distributors regularly subjected customers to further misrepresentations in trying to "save" the sale.  Despite that knowledge, Defendants allowed problematic distributors to remain in the "warm transfer" program to try to "save" their own sales.

110.    To remain in the "warm transfer" program, distributors were supposed to maintain a "passage rate" of transferred calls of over eighty percent.  Calls were

designated as "failures" based on certain agent misconduct, such as providing inaccurate information (e.g., stating "wellness product is major medical [insurance]," "refer[ing] to a discount program as insurance") or omitting key information (e.g., "ignore[ing] the mention of a pre-existing condition and not communicat[ing] impact to plan") to try to "save" a sale.

111.   The "warm transfer" scoring process revealed substantial additional misconduct.  For example, Defendants actually designated as failures more than ninety percent of the hundreds of warm transfer calls they reviewed during a months-long period in late 2016, including hundreds of calls involving Simple Health, but they continued to transfer customers to Simple Health and other problematic distributors.

112.   By October 2016, Benefytt's senior management was well aware that the warm transfer program was compounding the harm of their agents' initial misrepresentations.  For example, a compliance executive wrote to Defendants Southwell, Brady, and others: "We are continuing to see instances of poor customer service being provided by the Simple team through the warm-transfer pilot program."  The executive provided examples of problematic calls Defendants had reviewed, including one in which the Simple Health agent "used misleading tactics to retain the policy," and then "left the impression that the policy would be cancelled," but did not actually cancel it.

113.   Despite what the senior executive at Benefytt described to Defendant Southwell as "more than compelling proof" that Simple Health "reinforce[d] incorrect information," made "confusing and misleading statements" during warm transfer calls, and made "the cancellation process very difficult through avoidance," Defendants did not terminate Simple Health's participation in the program.  In fact, they continued to transfer consumers' cancellation calls to Simple Health until the FTC filed its enforcement action against the distributor in October 2018.

114.   In addition to the removal of the online cancellation option and the warm transfer program, Defendants have routinely attempted to make it harder for consumers to cancel or stop payment in other, less obvious ways.  For example, Defendant Brady noted to another Benefytt executive that a particular carrier was "calling customer[s] after every sale to make sure they understand what they bought."  Brady proposed that the carrier should use a "customer acknowledgment" form instead, like Defendants "did for other carriers," because "the follow up calls [were] causing very high cancel rates."

**Defendants' Deceptive, Unfair, and Abusive Conduct**
**Substantially Harmed Consumers**

115.   Defendants have long known that countless consumers have been left confused or worse as a result of their marketing and sales practices.  In a late 2017 internal email discussing preparations for a public earnings statement, for example,

Defendant Southwell discouraged colleagues from referencing that Benefytt had approximately one million active customers and that it fielded approximately 600,000 customer service calls that year.  Southwell pointed out that highlighting both numbers "could create more questions," because "it looks like [Benefytt received] a really high number of [customer service] calls – 60% of people had a question" about their purchase.

116.   Indeed, since 2014, Benefytt has received tens of thousands of complaints and cancellation requests related to deceptive, unfair, and abusive sales practices from consumers, business partners, state regulators, the Better Business Bureau, and private counsel.

117.   Simple Health alone generated nearly 10,000 complaints between 2014 and 2018, the majority of which related to agents' misrepresentations about or unauthorized charges for Benefytt Products.  Other top-selling distributors have generated thousands of similar complaints, and Defendants' misconduct did not end when the FTC sued Simple Health in October 2018.  In fact, one top-selling distributor alone has generated thousands of complaints since then.

118.   Many consumers report that they purchased Benefytt Products believing they possess key features of Qualified Health Plans, including that they will cover treatment for pre-existing conditions.  Consumers indicate that Defendants' agents have specifically claimed to offer plans that are materially

similar to or are actually Qualified Health Plans.  Consumers rely on these representations in agreeing to purchase Benefytt Products.  In numerous instances, consumers would not have purchased Benefytt Products if Defendants had told the truth about them during the sale.

119.   Many consumers pay Benefytt an enrollment fee and substantial monthly payments for what they believe to be comprehensive health insurance plans that will provide benefits equivalent to Qualified Health Plans.  Consumers have reported paying hundreds of dollars per month for Benefytt Products only to later learn that those products do not provide the promised coverage or benefits.

120.   Many consumers have been unable to use Benefytt Products for healthcare services typically covered by comprehensive major medical insurance.  Consumers frequently do not realize they are uninsured or underinsured until after incurring substantial medical expenses they thought would be covered.  Some consumers reported that they have incurred tens or even hundreds of thousands of dollars in medical bills due to Defendants' agents' misrepresentations.

121.   In numerous instances, Defendants have charged consumers for products the consumers did not want, and for which they did not provide their express, informed consent.  The charges for these ancillary products can total hundreds of dollars per transaction, which often are concealed from consumers and recur until cancelled.  Defendants' practice of charging consumers for products

Defendants have enrolled them in without their permission or keeping them enrolled in after they have asked to cancel has caused many millions of dollars in consumer losses, without providing benefits to consumers or competition.

122.    Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that Defendants are violating or are about to violate laws enforced by the Commission, because, among other things: Defendants have a long history of continuous conduct of the type described above; Defendants engaged in their unlawful acts and practices knowingly, and continued to employ unlawful practices outlined above after learning of the Commission's lawsuit against Simple Health and the Commission's investigation of Benefytt; the Corporate Defendants remain in the healthcare-related business and continue to use lead generators and telemarketing; and both the Corporate Defendants and the Individual Defendants maintain the means, ability, and incentive to engage in similar conduct in the future.

## **VIOLATIONS OF THE FTC ACT**

123.    Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

124.    Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

125.    Acts or practices are unfair under Section 5 of the FTC Act if they cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition. 15 U.S.C. § 45(n).

### Count I
### Deception: Misrepresentations Regarding the Features of Benefytt Products

126.    In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of a Benefytt Product, Defendants have represented, directly or indirectly, expressly or by implication, that the Benefytt Product:

    a.  is a Qualified Health Plan under the ACA or is "Obamacare";

    b.  provides benefits equivalent to Qualified Health Plans under the ACA, such as immediate coverage for the treatment of pre-existing conditions or prescription drug coverage; or

    c.  is comprehensive health insurance or major medical insurance, or provides benefits equivalent to such insurance.

127.    In truth and in fact, in numerous instances in which Defendants have made the representations set forth in Paragraph 126, the Benefytt Product:

    a.  is not a Qualified Health Plan under the Affordable Care Act or "Obamacare";

b. does not provide benefits equivalent to a Qualified Health Plan, such as immediate coverage for the treatment of pre-existing conditions or prescription drug coverage; and

c. is not comprehensive health insurance or major medical insurance, and does not provide benefits equivalent to such insurance.

128. Therefore, Defendants' representations, as set forth in Paragraph 126, above, are false, misleading, and unsubstantiated, and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**Count II**
**Deception: Misrepresentations Regarding Charges for Benefytt Products**

129. In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of a Benefytt Product, Defendants have represented, directly or indirectly, expressly or by implication, that:

a. the Benefytt Product is included at no additional cost with the purchase of another Benefytt Product; or

b. the charges for all Benefytt Products appearing on consumers' bills are authorized by the consumers.

130. In truth and in fact, in numerous instances in which Defendants have made the representations set forth in Paragraph 129:

a. the consumer is charged a separate fee for each Benefytt Product; and

      b.  consumers' bills include charges for Benefytt Products that the

         consumers had not authorized.

131.   Therefore, Defendants' representations, as set forth in Paragraph 129,

above, are false and misleading and constitute deceptive acts or practices in

violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**Count III**
**Unfairness: Unauthorized Charges**

132.   In numerous instances in connection with the marketing or sale of

Benefytt Products, Defendants have charged consumers for products or services for

which the consumers have not provided express, informed consent.

133.   Defendants' practices as described in Paragraph 132 cause or are

likely to cause substantial injury to consumers that consumers cannot reasonably

avoid themselves and that is not outweighed by countervailing benefits to

consumers or competition.

134.   Therefore, Defendants' acts or practices as set forth in Paragraph 132

constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15

U.S.C. §§ 45(a) and 45(n).

**<u>VIOLATIONS OF THE TELEMARKETING SALES RULE</u>**

135.   In 1994, Congress directed the FTC to prescribe rules prohibiting

abusive and deceptive telemarketing acts or practices pursuant to the

Telemarketing Act, 15 U.S.C. §§ 6101-6108.  The FTC adopted the original TSR

in 1995, extensively amended it in 2003, and amended certain provisions

thereafter.  16 C.F.R. Part 310.

136.  Defendants and their distributors and lead generators are "seller[s]" or

"telemarketer[s]" engaged in "telemarketing" as defined by the TSR, 16 C.F.R. §

310.2(dd), (ff), (gg).  A "seller" means any person who, in connection with a

telemarketing transaction, provides, offers to provide, or arranges for others to

provide goods or services to a customer in exchange for consideration.  16 C.F.R. §

310.2(dd).  A "telemarketer" means any person who, in connection with

telemarketing, initiates or receives telephone calls to or from a customer.  16

C.F.R. § 310.2(ff).  "Telemarketing" means a plan, program, or campaign which is

conducted to induce the purchase of goods or services or a charitable contribution,

by use of one or more telephones and which involves more than one interstate

telephone call.  16 C.F.R. § 310.2(gg).

137.  The TSR prohibits sellers and telemarketers from misrepresenting,

directly or by implication, in the sale of goods or services, any material aspect of

the performance, efficacy, nature, or central characteristics of the goods or services

that are the subject of a sales offer.  16 C.F.R. § 310.3(a)(2)(iii).  Likewise, the

TSR prohibits sellers and telemarketers from making any false or misleading

statements to induce a person to pay for goods or services.  16 C.F.R.

§ 310.3(a)(4).

138.   In addition, the TSR prohibits sellers and telemarketers from causing billing information to be submitted for payment, directly or indirectly, without the express informed consent of the customer.  16 C.F.R. § 310.4(a)(7).

139.   Among other things, the 2003 amendments to the TSR established a do-not-call registry, maintained by the FTC (the "National Do Not Call Registry"), of consumers who do not wish to receive certain types of telemarketing calls. Consumers can register their telephone numbers on the National Do Not Call Registry without charge, either through a toll-free telephone call or over the Internet at donotcall.gov.

140.   Consumers who receive telemarketing calls to their registered numbers can complain of National Do Not Call Registry violations the same way they registered, through a toll-free telephone call or over the Internet at donotcall.gov, or by otherwise contacting law enforcement authorities.

141.   The FTC allows sellers, telemarketers, and other permitted organizations to access the National Do Not Call Registry over the Internet at telemarketing.donotcall.gov, to pay the fee(s) if required, and to download numbers not to call.

142.   As amended, effective September 1, 2009, it is an abusive telemarketing act or practice and a violation of the TSR for a telemarketer to, or for a seller to cause a telemarketer to, initiate an outbound telephone call that delivers

a prerecorded message to induce the purchase of any good or service. 16 C.F.R. § 310.4(b)(1)(v).  Calls delivering prerecorded messages are commonly called "robocalls."

143.   It is a violation of the TSR for any person to provide substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any practice that violates Sections 310.3(a) or 310.4 of the TSR.  16 C.F.R. § 310.3(b).

144.   Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).  Section 19(a)(1) of the FTC Act, 15 U.S.C. § 57b(a)(1), provides that the FTC may commence a civil action against "any person, partnership, or corporation" who "violates any rule . . . respecting unfair or deceptive acts or practices."

## Count IV
### Deceptive Telemarketing Acts and Practices in Violation of the TSR: Product Features

145.   In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of a Benefytt Product, Defendants have represented, directly or indirectly, expressly or by implication, that the Benefytt Product:

    a.  is a Qualified Health Plan under the ACA or is "Obamacare";

    b.  provides benefits equivalent to Qualified Health Plans under the ACA, such as immediate coverage for the treatment of pre-existing conditions or prescription drug coverage; or

    c.  is comprehensive health insurance or major medical insurance, or provides benefits equivalent to such insurance.

146.  In truth and in fact, in numerous instances in which Defendants have made the representations set forth in Paragraph 145, the Benefytt Product:

    a.  is not a Qualified Health Plan under the Affordable Care Act or "Obamacare";

    b.  does not provide benefits equivalent to a Qualified Health Plan, such as immediate coverage for the treatment of pre-existing conditions or prescription drug coverage; and

    c.  is not comprehensive health insurance or major medical insurance, and does not provide benefits equivalent to such insurance.

147.  The acts or practices of Defendants as described in Paragraph 145, above, are deceptive telemarketing acts or practices that violate the TSR, 16 C.F.R. § 310.3(a).

**Count V**

**Deceptive Telemarketing Acts and Practices in Violation of the TSR:
Product Charges**

148.    In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of a Benefytt Product, Defendants have represented, directly or indirectly, expressly or by implication, that:

    a.  the Benefytt Product is included at no additional cost with the purchase of another Benefytt Product; or

    b.  the charges for all Benefytt Products appearing on consumers' bills are authorized by the consumers.

149.    In truth and in fact, in numerous instances in which Defendants have made the representations set forth in Paragraph 148:

    a.  the consumer is charged a separate fee for each Benefytt Product; and

    b.  consumers' bills include charges for Benefytt Products that consumers had not authorized.

150.    The acts or practices of Defendants as described in Paragraph 148, above, are deceptive telemarketing acts or practices that violate the TSR, 16 C.F.R. § 310.3(a).

**Count VI**
**Assisting and Facilitating Violations of the TSR: Deception**

151.   In numerous instances in connection with telemarketing, Defendants

have provided substantial assistance or support to one or more distributors or lead

generators even though Defendants know or consciously avoided knowing that one

or more such distributors or lead generators are engaged in violations of § 310.3(a)

of the TSR.

152.   Defendants' acts or practices as described in Paragraph 151, above,

are deceptive telemarketing acts or practices that violate the TSR, 16 C.F.R. §

310.3(b).

**Count VII**
**Abusive Telemarketing Acts and Practices in Violation of the TSR:**
**Failure to Obtain Express, Informed Consent**

153.   In numerous instances, in connection with the marketing or sale of

Benefytt Products, Defendants have charged consumers for products or services for

which the consumers have not provided express, informed consent in violation the

TSR, 16 C.F.R. § 310.4(a)(7).

**Count VIII**
**Abusive Telemarketing Acts and Practices in Violation of the TSR:**
**Initiation of Calls to Numbers on the National Do Not Call Registry**

154.   In numerous instances, in connection with the marketing or sale of

Benefytt Products, Defendants have initiated or caused the initiation of outbound

telephone calls to telephone numbers on the National Do Not Call Registry to

induce the purchase of goods or services in violation of the TSR, 16 C.F.R. §

310.4(b)(1)(iii)(B).

### Count IX
### Abusive Telemarketing Acts and Practices in Violation of the TSR:
### Initiation of Unlawful Prerecorded Messages

155.   In numerous instances, in connection with the marketing or sale of

Benefytt Products, Defendants have initiated or caused the initiation of outbound

telephone calls that delivered prerecorded messages to induce the purchase of

goods or services in violation of the TSR, 16 C.F.R. § 310.4(b)(1)(v).

### Count X
### Assisting and Facilitating Violations of the TSR:
### National Do Not Call Registry and Prerecorded Messages

156.  In numerous instances in connection with telemarketing, Defendants

have provided substantial assistance or support to one or more distributors or lead

generators even though Defendants know or consciously avoid knowing that one or

more such distributors or lead generators are engaged in violations of §§

310.4(b)(1)(iii)(B) and (b)(1)(v) of the TSR.

157.  Defendants' acts or practices as described in Paragraph 156, above,

are abusive telemarketing acts or practices that violate the TSR, 16 C.F.R. §

310.3(b).

## VIOLATIONS OF THE
## RESTORE ONLINE SHOPPERS' CONFIDENCE ACT

158. In 2010, Congress passed the Restore Online Shoppers' Confidence
Act, 15 U.S.C §§ 8401 *et seq*., which became effective on December 29, 2010.
Congress passed ROSCA because "[c]onsumer confidence is essential to the
growth of online commerce. To continue its development as a marketplace, the
Internet must provide consumers with clear, accurate information and give sellers
an opportunity to fairly compete with one another for consumers' business."
Section 2 of ROSCA, 15 U.S.C. § 8401.

159. Section 4 of ROSCA, 15 U.S.C. § 8403, generally prohibits charging
consumers for goods or services sold in transactions effected on the Internet
through a negative option feature, as that term is defined in the Commission's
Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310.2(w), unless the seller (1)
clearly and conspicuously discloses all material terms of the transaction before
obtaining the consumer's billing information, (2) obtains the consumer's express
informed consent before making the charge, and (3) provides a simple mechanism
to stop recurring charges. *See* 15 U.S.C. § 8403.

160. The TSR defines a negative option feature as: "in an offer or
agreement to sell or provide any goods or services, a provision under which the
customer's silence or failure to take an affirmative action to reject goods or

services or to cancel the agreement is interpreted by the seller as acceptance of the offer." 16 C.F.R. § 310.2(w).

161. As described in Paragraphs 24, 63-65, and 121 above, Defendants have advertised and sold Benefytt Products to consumers through a negative option feature as defined by the TSR. *See* 16 C.F.R. § 310.2(w).

162. Pursuant to Section 5 of ROSCA, 15 U.S.C. § 8404, a violation of ROSCA is a violation of a rule promulgated under Section 18 of the FTC Act, 15 U.S.C. § 57a.

### Count XI
### Failure to Disclose All Material Terms in Violation of ROSCA

163. In numerous instances, Defendants have charged or attempted to charge consumers for Benefytt Products sold in transactions effected on the Internet through a negative option feature without clearly and conspicuously disclosing all material terms of the transaction before obtaining consumers' billing information.

164. Defendants' acts or practices, as described in Paragraph 163 above, constitute a violation of Section 4(1) of ROSCA, 15 U.S.C. § 8403(1), and are therefore a violation of a rule promulgated under Section 18 of the FTC Act, 15 U.S.C. § 57a.

## Count XII
### Failure to Obtain Consumers' Express Informed Consent
### in Violation of ROSCA

165.  In numerous instances, Defendants have charged or attempted to

charge consumers for Benefytt Products sold in transactions effected on the

Internet through a negative option feature without obtaining consumers' express

informed consent before charging their credit card, debit card, bank account, or

other financial account for the Benefytt Products.

166.  Defendants' acts or practices, as described in Paragraph 165 above,

constitute a violation of Section 4(2) of ROSCA, 15 U.S.C. § 8403(2), and are

therefore a violation of a rule promulgated under Section 18 of the FTC Act, 15

U.S.C. § 57a.

## Count XIII
### Failure to Provide a Simple Cancellation Mechanism in Violation of ROSCA

167.  In numerous instances, Defendants have charged or attempted to

charge consumers for Benefytt Products sold in transactions effected on the

Internet through a negative option feature without providing simple mechanisms

for a consumer to stop recurring charges for products to the consumer's credit card,

debit card, bank account, or other financial account.

168.  Defendants' acts or practices, as described in Paragraph 167 above,

constitute a violation of Section 4(3) of ROSCA, 15 U.S.C. § 8403(3), and are

therefore a violation of a rule promulgated under Section 18 of the FTC Act, 15 U.S.C. § 57a.

## CONSUMER INJURY

169.    Consumers have suffered and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act, the TSR, and ROSCA. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers and harm the public interest.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff requests that the Court:

A.    Enter judgment against Defendants and in favor of Plaintiff for each violation alleged in this complaint;

B.    Enter a permanent injunction to prevent future violations of the FTC Act, the TSR, and ROSCA by Defendants;

C.    Award monetary and other relief within the Court's power to grant; and

D.    Award any additional relief as the Court determines to be just and proper.

Dated: August 8, 2022          Respectfully submitted,


                               */s/ Matthew G. Schiltz*
                               _____
                               MATTHEW G. SCHILTZ
                               mschiltz@ftc.gov; (312) 960-5619
                               CLAIRE E. W. STEWART
                               cstewart@ftc.gov; (312) 960-5615
                               ELIZABETH C. SCOTT
                               escott@ftc.gov; (312) 960-5609

                               Federal Trade Commission
                               230 S. Dearborn Street, Suite 3030
                               Chicago, Illinois  60604
                               Telephone:  (312) 960-5634
                               Facsimile: (312) 960-5600

                               Attorneys for Plaintiff
                               FEDERAL TRADE COMMISSION