# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br>Plaintiff,<br><br>vs.<br><br>BENEFYTT TECHNOLOGIES, INC., f/k/a<br>HEALTH INSURANCE INNOVATIONS,<br>INC.;<br><br>HEALTH PLAN INTERMEDIARIES<br>HOLDINGS, LLC;<br><br>HEALTHPOCKET, INC., d/b/a<br>AGILEHEALTHINSURANCE;<br><br>GAVIN D. SOUTHWELL, individually and<br>as a former officer, director, and manager of<br>Benefytt Technologies, Inc., Health Plan<br>Intermediaries Holdings, LLC, and<br>HealthPocket, Inc.; and<br><br>AMY E. BRADY, individually and as a<br>former vice president and manager of<br>Benefytt Technologies, Inc. and Health Plan<br>Intermediaries Holdings, LLC.<br><br>Defendants. | Case No. 8:22-cv-01794-TPB-JSS<br><br>STIPULATED ORDER FOR<br>PERMANENT INJUNCTION,<br>MONETARY JUDGMENT, AND<br>OTHER RELIEF AGAINST<br>DEFENDANTS BENEFYTT<br>TECHNOLOGIES, INC.,<br>HEALTH PLAN<br>INTERMEDIARIES<br>HOLDINGS, LLC, AND<br>HEALTHPOCKET, INC. |

Plaintiff, the Federal Trade Commission ("Commission" or "FTC"), filed its

Complaint for Permanent Injunction, Monetary Relief, and Other Relief

("Complaint") in this matter, pursuant to Sections 5(a)(1), 5(m)(1)(A), 13(b), and

Page 1 of 41

19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 45(a)(1), 45(m)(1)(A), 53(b), 57b, the Telemarketing and Consumer Fraud and Abuse Act ("Telemarketing Act"), 15 U.S.C. §§ 6101-6108, and Section 5 of the Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. § 8404.   The Commission and Defendants Benefytt Technologies, Inc., Health Plan Intermediaries Holdings, LLC, and HealthPocket, Inc. ("Corporate Defendants") stipulate to the entry of this Stipulated Order for Permanent Injunction, Monetary Judgment, and Other Relief ("Order") to resolve all matters in dispute in this action between them.

THEREFORE, IT IS ORDERED as follows:

### FINDINGS

1. This Court has jurisdiction over this matter.

2. The Complaint charges that Defendants participated in deceptive, unfair, and abusive acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45, the FTC's Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310, as amended, and Section 4 of ROSCA, 15 U.S.C. § 8403, in connection with the advertising, marketing, telemarketing, promoting, offering for sale, or sale of association memberships and related health products, including short-term medical plans, limited benefit plans, and medical discount plans.

3.    Corporate Defendants neither admit nor deny any of the allegations in the Complaint, except as specifically stated in this Order.    Only for purposes of this action, Corporate Defendants admit the facts necessary to establish jurisdiction.

4.    Corporate Defendants waive any claim that they may have under the Equal Access to Justice Act, 28 U.S.C. § 2412, concerning the prosecution of this action through the date of this Order, and agree to bear their own costs and attorney fees.

5.    Corporate Defendants waive all rights to appeal or otherwise challenge or contest the validity of this Order.

## DEFINITIONS

For the purpose of this Order, the following definitions apply:

A.    **"ACA"** means the Patient Protection and Affordable Care Act of 2010, Pub. L. No 111-148, 124 Stat. 119.

B.    **"Billing Information"** means any data that enables any person to access a customer's account, such as a credit card, checking, savings, share or similar account, utility bill, mortgage loan account, or debit card.

C.    **"Charge," "Charged," or "Charging"** means any attempt to collect money or other consideration from a consumer, including causing Billing Information to be submitted for payment, including against the consumer's credit card, debit card, bank account, telephone bill, or other account.

Page 3 of 41

D.    **"Clear(ly) and conspicuous(ly)"** means that a required disclosure is difficult to miss (i.e., easily noticeable) and easily understandable by ordinary consumers, including in all of the following ways:

1.    In any communication that is solely visual or solely audible, the disclosure must be made through the same means through which the communication is presented.   In any communication made through both visual and audible means, such as a television advertisement, the disclosure must be presented simultaneously in both the visual and audible portions of the communication even if the representation requiring the disclosure is made in only one means.

2.    A visual disclosure, by its size, contrast, location, the length of time it appears, and other characteristics, must stand out from any accompanying text or other visual elements so that it is easily noticed, read, and understood.

3.    An audible disclosure, including by telephone or streaming video, must be delivered in a volume, speed, and cadence sufficient for ordinary consumers to easily hear and understand it.

4.    In any communication using an interactive electronic medium, such as the Internet or software, the disclosure must be unavoidable.

Page 4 of 41

5.     The disclosure must use diction and syntax understandable to ordinary consumers and must appear in each language in which the representation that requires the disclosure appears.

6.     The disclosure must comply with these requirements in each medium through which it is received, including all electronic devices and face-to-face communications.

7.     The disclosure must not be contradicted or mitigated by, or inconsistent with, anything else in the communication.

8.     When the representation or sales practice targets a specific audience, such as children, the elderly, or the terminally ill, "ordinary consumers" includes reasonable members of that group.

E.     **"Covered Information"** means information from or about an individual consumer, including (a) first and last name; (b) a home or other physical address; (c) an email address or other online contact information, such as an instant messaging user identifier or a screen name; (d) a telephone number; (e) a Social Security number; (f) a driver's license or other government-issued identification number; (g) a financial institution account number; (h) credit or debit card information; (i) precise geolocation data of an individual or mobile device, including GPS-based, WiFi-based, or cell-based location information; or (j) an

Page 5 of 41

authentication credential, such as a username or password.

F.     **"Defendants"** means all of the Individual Defendants and the Corporate Defendants, individually, collectively, or in any combination.

1.     **"Corporate Defendants"** means Benefytt Technologies, Inc., f/k/a Health Insurance Innovations, Inc., Health Plan Intermediaries Holdings, LLC, HealthPocket, Inc. d/b/a AgileHealthInsurance, and their successors and assigns.

2.     **"Individual Defendants"** means Gavin D. Southwell and Amy E. Brady.

G.     **"Distributor"** means any person who advertises, markets, provides, offers to provide, or arranges for others to provide any good or service to a customer in exchange for consideration.

H.     **"Lead Generation"** means (a) using marketing techniques to identify or attract prospective customers' interest in a third party's product or service; (b) obtaining, or assisting others in obtaining, Covered Information of prospective customers for a third-party's product or service; or (c) providing any such Covered Information of prospective customers to a third party.

I.     **"Lead Generator"** means any person who offers or has provided, in exchange for consideration, Covered Information to a Defendant or Distributor, or who assists others in providing such information to a Defendant or Distributor.

J.      **"Negative Option Feature"** means, in an offer or agreement to sell or provide any good or service, a provision under which the consumer's silence or failure to take affirmative action to reject a good or service or to cancel the agreement is interpreted by the seller or provider as acceptance or continuing acceptance of the offer.

K.      **"Outbound Telephone Call"** means a telephone call initiated by a Telemarketer to induce the purchase of goods or services or to solicit a charitable contribution.

L.      **"Seller"** means any person who, in connection with a Telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration whether or not such person is under the jurisdiction of the Commission.

M.      **"Telemarketer"** means any person who, in connection with Telemarketing, initiates or receives telephone calls to or from a customer or donor, whether or not such person is under the jurisdiction of the Commission.

N.      **"Telemarketing"** means a plan, program, or campaign which is conducted to induce the purchase of goods or services or a charitable contribution, by use of one or more telephones and which involves more than one interstate telephone call, whether or not covered by the Telemarketing Sales Rule.

## ORDER

## I. PROHIBITED BUSINESS PRACTICES

IT IS ORDERED that Corporate Defendants, Corporate Defendants' officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with advertising, marketing, promoting, or offering for sale any good or service, are permanently restrained and enjoined from:

A.    Misrepresenting or assisting others in misrepresenting, expressly or by implication:

1.    any cost to the consumer to purchase, receive, use, or return the good or service;

2.    that any good or service is included at no additional cost with the purchase of another good or service;

3.    that any good or service is a qualified health plan under the ACA or is "Obamacare";

4.    that any good or service provides benefits equivalent to a qualified health plan under the ACA;

5.    that any good or service is comprehensive health insurance or

Page 8 of 41

major medical insurance, or provides benefits equivalent to such insurance; or

6.   any other fact material to consumers concerning any good or service, such as:   the total costs; any material restrictions, limitations, or conditions; or any material aspect of its performance, efficacy, nature, or central characteristics;

B.   Making any representation, or assisting others in making any representation, expressly or by implication, unless the representation is non-misleading, and, at the time such representation is made, Corporate Defendants possess and rely upon competent and reliable evidence that is sufficient in quality and quantity to substantiate that the representation is true, regarding any good or service;

C.   Failing to disclose, or assisting others in failing to disclose, Clearly and Conspicuously, before requesting any Billing Information from a consumer:

1.   the complete name of each good or service to be purchased, the name of the seller or provider of each good or service to be purchased, and, if the name of the seller or provider will not appear on billing statements, the billing descriptor that will appear on such statements;

2.   a description of each good or service;

Page 9 of 41

3. all costs and fees, itemized by each good or service to be purchased;

4. all applicable exclusions, limitations, or waiting periods related to the use of any good or service;

5. the terms of any refund, cancellation, exchange, or repurchase policy for any good or service, including the extent to which the consumer must take affirmative action to avoid any Charges; and

6. the simple cancellation method to stop any recurring Charges, as required by Subsection I.G;

D. Causing any consumer to be billed for any good or service without having previously obtained the consumer's express informed consent;

E. Failing to send the consumer:

1. Immediately after the consumer's submission of an online order, written confirmation of the transaction by email if Corporate Defendants are in possession of the consumer's email address. The email must Clearly and Conspicuously disclose all the information required by Subsection I.C, and contain a subject line reading "Order Confirmation" along with the name of the good(s) or service(s), and no additional information. If Corporate Defendants are not in possession

Page 10 of 41

of the consumer's email address, Corporate Defendants must provide confirmation to online purchasers or cancel the transaction as set forth in Subsection I.E.2; or

2.      Within 2 days after receipt of the consumer's order by mail or telephone, or where a consumer who submitted an order online did not provide Corporate Defendants with an email address, a written confirmation of the transaction, either by email or first class mail. The email or letter must Clearly and Conspicuously disclose all the information required by Subsection I.C.   The subject line of the email must Clearly and Conspicuously state "Order Confirmation" along with the name of the good(s) or service(s), and nothing else.   The outside of the envelope must Clearly and Conspicuously state "Order Confirmation" along with "Important Information About Your Recent Purchase and Enrollment," and no additional information other than the consumer's address, the sending Defendant's return address, and postage.   *Provided, however,* that if Corporate Defendants are not in possession of either an email address or a physical address for a consumer and cannot obtain such information and send confirmation of the purchase within 2 days after receipt of an order pursuant to this

Page 11 of 41

Subsection, Corporate Defendants must immediately cancel the consumer's purchase and refund all charges;

F.      Representing directly or indirectly, expressly or by implication, that any good or service that includes a Negative Option Feature is being offered on a free, trial, no obligation, reduced, or discounted basis, without disclosing Clearly and Conspicuously:

1.      The extent to which the consumer must take any affirmative action to avoid any Charges: a) for the offered good or service, b) of an increased amount after the trial or promotional period ends, and c) on a recurring basis;

2.      The total cost (or range of costs) the consumer will be Charged and, if applicable, the frequency of such Charges unless the consumer timely takes steps to prevent or stop such Charges; and

3.      The deadline(s) (by date or frequency) by which the consumer must affirmatively act in order to stop all recurring Charges.

G.      Failing to provide a simple and easy-to-use method by which consumers can cancel the Charge for any good or service; such method must not be difficult, costly, confusing, or time consuming, and must be at least as simple as the method the consumer used to initiate the Charge(s);

H.    Failing to promptly cancel a consumer's purchase of any good or service after receiving the consumer's cancellation request; or

I.    Causing a consumer, after the consumer requests to cancel any good or service, to continue being billed for any other good or service without obtaining that consumer's express informed consent.

## II. INJUNCTION CONCERNING DUE DILIGENCE AND MONITORING

IT IS FURTHER ORDERED that Corporate Defendants, Corporate Defendants' officers, agents, employees, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with advertising, marketing, promoting or offering for sale any good or service, are hereby restrained and enjoined from:

A.    Failing to, as a condition of doing business with any Distributor or Lead Generator:   (a) provide each such Distributor or Lead Generator a copy of this Order within 7 days of entry of this Order; (b) Clearly and Conspicuously disclose in writing that engaging in acts and practices prohibited by the Order will result in immediate termination of any Distributor or Lead Generator and forfeiture of all monies owed to such Distributor or Lead Generator; and (c) either (i) obtain from each such Distributor or Lead Generator, within 30 days of entry of this Order, a signed and dated statement acknowledging receipt of this Order and expressly

agreeing to comply with this Order or (ii) cease doing business with each such Distributor or Lead Generator until such time as the Distributor or Lead Generator has provided a signed and dated statement acknowledging receipt of this Order and expressly agreeing to comply with this Order;

B.      Failing to require that each Distributor or Lead Generator, before using any material to advertise, market, promote, offer for sale, or sell any good or service on Corporate Defendants' behalf, provide Corporate Defendants with the following information: (a) copies of all such material, including sales scripts or marketing text, graphics, videos, audio, and photographs; (b) the location where any such material is to be displayed online, as denoted by a unique URL; (c) the URL of any hyperlink contained in such material; and (d) the range of dates the material is to be used;

C.      Prior to the use of any materials submitted to Corporate Defendants pursuant to Subsection II.B above, failing to review the materials for compliance with this Order.   If such material does not comply with this Order, Corporate Defendants must inform the Distributor or Lead Generator in writing that approval for its use is denied, and Corporate Defendants must not pay any amounts to the Distributor or Lead Generator related to the creation or use of such material;

D.      Failing to monitor any sales campaign conducted by any Distributor or

Lead Generator on Corporate Defendants' behalf to determine whether such Distributor or Lead Generator is engaging in acts or practices prohibited by this Order. Such monitoring must, at minimum, include, on at least a weekly basis, obtaining and reviewing all sales scripts, obtaining and listening to audio, video, or other recordings of a statistically significant sample of randomly selected interactions between the Distributor or Lead Generator and consumers, obtaining and reviewing copies of any material identified in Subsection II.B of this Order that Corporate Defendants have not yet obtained and verified pursuant to Subsection II.C of this Order, reviewing all consumer reviews and complaints Corporate Defendants receive regarding the Distributor or Lead Generator, obtaining and reviewing the Distributor or Lead Generator's sales and compliance policies and procedures, and conducting due diligence regarding any prior law enforcement actions or Telemarketing-related legal proceedings initiated against the Distributor or Lead Generator;

E.     Failing to promptly and completely investigate any complaints or other information that any Corporate Defendant receives concerning whether a Distributor or Lead Generator is engaging in acts or practices prohibited by this Order; or

F.     Failing to promptly and permanently terminate business with and

Page 15 of 41

refuse to pay any monies owed to any Distributor or Lead Generator that has committed fraud or engaged in acts or practices prohibited by this Order. Corporate Defendants must also promptly notify any affected customer who is enrolled in any of Corporate Defendants' products or services of the termination, offer and then issue any requested refund to the customer, and obtain express, informed consent to continue billing the customer thereafter.

## III. PROHIBITION AGAINST ABUSIVE TELEMARKETING PRACTICES

IT IS FURTHER ORDERED that Corporate Defendants, Corporate Defendants' officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are permanently restrained and enjoined from engaging in, or assisting and facilitating others in engaging in, any of the following practices:

A.     Initiating any Outbound Telephone Call, or causing others to initiate any Outbound Telephone Call, in which the Telemarketer fails to disclose truthfully, promptly, and in a Clear and Conspicuous manner to the person receiving a call:

1. the identity of the Seller;

2. that the purpose of the call is to sell goods or services; and

Page 16 of 41

3. the nature of the goods or services;

B. Abandoning, or causing others to abandon, any Outbound Telephone Call to a person by failing to connect the call to a live operator within 2 seconds of the person's completed greeting, unless the Seller or Telemarketer proves that the following 4 conditions are met:

1. the Seller or Telemarketer employs technology that ensures abandonment of no more than 3 percent of all calls answered by a person, measured over the duration of a single calling campaign, if less than 30 days, or separately over each successive 30-day period or portion thereof that the campaign continues;

2. the Seller or Telemarketer, for each Telemarketing call placed, allows the telephone to ring for at least 15 seconds or 4 rings before disconnecting an unanswered call;

3. whenever a live operator is not available to speak with the person answering the call within 2 seconds after the person's completed greeting, the Seller promptly plays a recorded message that states the Seller's name and telephone number; and

4. the Seller retains records establishing compliance with the preceding 3 conditions;

C.    Initiating any Outbound Telephone Calls, or causing others to initiate any Outbound Telephone Calls, that delivers a prerecorded message, other than a prerecorded message permitted for compliance with Subsection III.B.3 of this Order, unless the Seller or Telemarketer proves that:

1.    Before making any such call to induce the purchase of any good or service, the Seller has obtained from the recipient of the call an express agreement, in writing, that:

a.    the Seller obtained only after a Clear and Conspicuous disclosure that the purpose of the agreement is to authorize the Seller to place prerecorded calls to such person;

b.    the Seller obtained without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service;

c.    evidences the willingness of the recipient of the call to receive calls that deliver prerecorded messages by or on behalf of the specific Seller; and

d.    includes such person's telephone number and signature; and

2.    In any such call to induce the purchase of any good or service, the Seller or Telemarketer:

a.      allows the telephone to ring for at least 15 seconds or 4 rings before disconnecting an unanswered call; and

b.      within 2 seconds after the completed greeting of the person called, plays a prerecorded message that promptly discloses the Seller's identity, that the purpose of the call is to sell goods or services, and the nature of the goods or services, followed immediately by a disclosure of one or both of the following:

i.      in the case of a call that could be answered in person by a consumer, that the person called can use an automated interactive voice and/or keypress-activated opt-out mechanism to assert a do-not-call request at any time during the message.   The mechanism must:

(a)     automatically add the number called to the Seller's Entity-Specific Do Not Call List;

(b)     once invoked, immediately disconnect the call; and

(c)     be available for use at any time during the message; and

Page 19 of 41

ii.    in the case of a call that could be answered by an answering machine or voicemail service, that the person called can use a toll free-number to assert a do-not-call request.   The number provided must connect directly to an automated interactive voice or keypress-activated opt-out mechanism that:

(a)    automatically adds the number called to the Seller's Entity-Specific Do Not Call List;

(b)    immediately thereafter disconnects the call; and

(c)    is accessible at any time throughout the duration of the Telemarketing campaign;

D.    Initiating any Outbound Telephone Calls, or causing others to initiate Outbound Telephone Calls, to any person's telephone number on the National Do Not Call Registry, unless the Seller or Telemarketer proves that:

1.    the Seller has obtained the express agreement, in writing, of such person to place calls to that person.   Such written agreement must clearly evidence such person's authorization that calls made by or on behalf of the Seller may be placed to that person, and must include

the telephone number to which the calls may be placed and the signature of that person; or

2.      the Seller has an Established Business Relationship with such person, and that person has not previously stated that he or she does not wish to receive Outbound Telephone Calls made by or on behalf of the Seller;

E.      Initiating Outbound Telephone Calls, or causing another to initiate Outbound Telephone Calls, to a person who has previously stated that he or she does not wish to receive an Outbound Telephone Call made by or on behalf of the Seller;

F.      Initiating Outbound Telephone Calls, or causing others to initiate Outbound Telephone Calls, to a telephone number within a given area code when the Seller has not, either directly or through another person, paid the required annual fee for access to the telephone numbers within that area code that are included in the National Do Not Call Registry unless the telephone call is:

1.      a solicitation to induce charitable contributions;

2.      to a business;

3.      to persons who have given the Seller their express agreement, in writing and signed, to receive calls from Seller; or

Page 21 of 41

4.      to persons who have an Established Business Relationship with Seller; or

G.      Violating the Telemarketing Sales Rule, 16 C.F.R. Part 310, attached as Appendix A to this Order.

## IV. CUSTOMER NOTIFICATION AND CANCELLATION

IT IS FURTHER ORDERED that Corporate Defendants must:

A.      Within 30 days after entry of this Order, notify each customer who as of the date of entry of this Order is enrolled in any of Corporate Defendants' short-term medical plans, limited/health benefit plans, or any products or services Corporate Defendants have sold as a supplement for, ancillary to, or contemporaneously with the sale of a short-term medical plan or limited/health benefit plan, using the notification provided as Appendix B to this Order. Notification must be given:

1.      By electronic mail from the same email address used to provide the customer with any post-purchase product or Billing Information to each email address of the customer known to Corporate Defendants. Corporate Defendants must track and record customers' engagement with such emailed notices, including whether notice sent to each email address could be delivered, whether an email was opened, whether a

person clicked through any link in the email, and any other information required to submit the declaration pursuant to Subsection IV.C. Five days after emailing initial notice to a customer pursuant to this Subsection, Corporate Defendants must send to each customer whose initial email notice could not be delivered or remains unopened a second email notice with **"REMINDER"** in the subject line and in a form otherwise identical to the initial notice;

2. By written notice on Corporate Defendants' letterhead sent to the most recent address of the customer known to Corporate Defendants, or any other address that Corporate Defendants determine is current. Corporate Defendants must conduct an address trace for each written notice that is returned undelivered. For each customer whose address is updated or confirmed by the address trace, Corporate Defendants must send supplemental notice in a form identical to the original notice to the customer's updated or confirmed address; and

3. Beginning 45 days after entry of this Order, and in no event later than 60 days after entry of this Order, for each customer who has not contacted Corporate Defendants in response to a written notice sent pursuant to Subsection IV.A.2 and whose email notices could not be

Page 23 of 41

delivered or remain unopened, Corporate Defendants must attempt to provide the information set forth in Appendix B by calling the customer using the most current telephone number(s) known to Corporate Defendants.   If any such call to a customer goes unanswered, Corporate Defendants must leave a message if possible. The introduction for such calls that are answered and any message left if such calls go unanswered must be scripted, and must conform to the requirements of Subsection IV.B;

B.     Use only scripts, FAQs, or similar guidance provided to and approved by staff of the FTC when interacting with customers regarding the notification required by Subsection IV.A;

C.     Ninety days after entry of this Order, provide to the Commission a signed declaration sworn under penalty of perjury containing the following information:

1.     The name of each customer required to be notified, and each customer's: (i) mailing address; (ii) email address(es); and (iii) telephone number(s);

2.     Regarding the email notices required pursuant to Subsection IV.A.1: (i) the number of unique customers who were sent an initial

Page 24 of 41

email notice and the number of those customers who were sent a second email notice; (ii) the number of undeliverable emails in the initial round of email notice and the number of undeliverable emails in any second round of email notice; (iii) the number of unique customers for whom email notices were delivered, but all email notices sent remain unopened; (iv) the number of unique customers who clicked through any link in an email notice; and (v) the name of each customer for whom all email notices were undeliverable or have not been opened;

3.    Regarding the mailed notice required pursuant to Subsection IV.A.2, the name of each customer for whom all notices sent were returned undelivered; and

4.    The name of each customer Corporate Defendants called pursuant to Subsection IV.A.3, and for each such customer, whether Corporate Defendants left a message, spoke with the customer, or were not able to reach the customer by phone;

D.    Within 14 days after receiving any request for cancellation from a customer who was sent the notification specified in Subsection IV.A, cancel any such good or service and any future Charges for such good or service.   For each

such cancellation request that Corporate Defendants receive within 105 days of entry of this Order, Corporate Defendants must also refund all Charges incurred by the customer on or after the date of entry of this Order for that good or service. Corporate Defendants must issue such refunds within 14 days after receiving the customer's cancellation request to the source of the initial Charge (such as credit or debit card) or, if that option is not available, issue a check to the customer by first class mail; and

E.     Within 14 days after receiving a request for cancellation from any consumer who was sent the notification specified in Subsection IV.A, provide the Commission with documentation sufficient to show the customer's name, contact information, each good or service in which the customer was enrolled, the total amount of all Charges incurred by the customer, the amount of Charges incurred by the customer on or after the entry of this Order, and the amount refunded to the customer.

## V. MONETARY JUDGMENT

IT IS FURTHER ORDERED that:

A.     Judgment in the amount of One Hundred Million Dollars ($100,000,000) is entered in favor of the Commission against Corporate Defendants, jointly and severally, as monetary relief.

Page 26 of 41

B.      Corporate Defendants are ordered to pay to the Commission One Hundred Million Dollars ($100,000,000) as monetary relief, as follows:

1.      Corporate Defendants stipulate that Five Million Dollars ($5,000,000) is being held in a third-party escrow account for no purpose other than payment to the Commission. Corporate Defendants must pay the Commission Five Million Dollars ($5,000,000) within 7 days of entry of this Order by electronic fund transfer in accordance with instructions previously provided by a representative of the Commission.

2.      Corporate Defendants must pay to the Commission an additional Forty-Five Million Dollars ($45,000,000) by the later of June 1, 2022 and 7 days of entry of this Order, by electronic fund transfer in accordance with instructions previously provided by a representative of the Commission.

3.      In addition to the payment required by Subsection V.B.2., Corporate Defendants must also pay to the Commission an additional Fifty Million Dollars ($50,000,000) by the later of June 1, 2022 and 7 days of entry of this Order, by electronic fund transfer in accordance with instructions previously provided by a representative of the Commission. *Provided, however,* that if Corporate Defendants submit to a representative of the FTC a declaration from Benefytt Technologies, Inc.'s Chief Executive Officer or Chief

Page 27 of 41

Financial Officer sworn under penalty of perjury stating that Corporate Defendants sought in good faith but failed to obtain third-party financing sufficient to make the full payment required under this Subsection and continue operating:

a.     Corporate Defendants must pay the Commission an additional Fifty Million Dollars ($50,000,000) in ten (10) installments as follows: Beginning on the later of September 1, 2022 and 7 days after entry of this Order, and at each 30-day interval thereafter, including and until 300 days after the date of the first of any such installment payments, Corporate Defendants shall pay the Commission Five Million Dollars ($5,000,000) by electronic fund transfer in accordance with instructions previously provided by a representative of the Commission;

b.     If an installment due date required under Subsection V.B.3.a falls on a weekend or federal holiday, that payment shall be deemed timely if made no later than the next business day thereafter, but shall not affect any subsequent payment due dates.   The same day Corporate Defendants make each electronic fund transfer required pursuant to Subsection V.B.3.a other than the final payment, Corporate

Defendants must submit to a representative of the FTC a declaration from Benefytt Technologies, Inc.'s Chief Executive Officer or Chief Financial Officer sworn under penalty of perjury stating that Corporate Defendants are unable to pay the balance owed under Subsection V.B.3 and continue operating.   Corporate Defendants must continue to seek in good faith sufficient third-party financing to pay the balance owed under Subsection V.B.3.   Until Corporate Defendants pay in full the Fifty Million Dollars ($50,000,000) required pursuant to Subsection V.B.3, Corporate Defendants must submit to a representative of the FTC condensed quarterly financial statements within 30 days after the close of the preceding financial quarter;

c.      If Corporate Defendants fail to make a required payment when due under Subsection V.B.3.a, or the Commission is not allowed to retain any such payment, the entire judgment amount ($100,000,000), less any amount previously paid by Corporate Defendants, shall immediately become due and payable by Corporate Defendants. Interest computed at the rate prescribed under 28 U.S.C. § 1961, as amended, shall immediately begin to accrue on the unpaid balance. Time is of the essence for all installment payments specified in

Page 29 of 41

Subsection V.B.3.a; and

d.      Notwithstanding the foregoing, Corporate Defendants shall have the right to prepay at any time, and without penalty, the remaining balance, or any part thereof, due the Commission under this Subsection.   Any such prepayment made prior to an installment due date shall be credited as if made on the next installment due date, and Corporate Defendants shall be relieved of making any further payments on the installment due date for any prepayments to the extent of such prepayment.   Nothing herein shall be construed to relieve Corporate Defendants of their obligations to make timely payment for any installments as they become due that have not otherwise fully been paid in advance.

C.      Corporate Defendants relinquish dominion and all legal and equitable right, title, and interest in all assets transferred pursuant to this Order and may not seek the return of any assets.

D.      The facts alleged in the Complaint will be taken as true, without further proof, in any subsequent civil litigation by or on behalf of the Commission, including in a proceeding to enforce its rights to any payment or monetary judgment pursuant to this Order, such as a nondischargeability complaint in any bankruptcy

case.

E.      The facts alleged in the Complaint establish all elements necessary to sustain an action by the Commission pursuant to Section 523(a)(2)(A) of the Bankruptcy Code, 11 U.S.C. § 523(a)(2)(A), and this Order will have collateral estoppel effect for such purposes.

F.      Corporate Defendants acknowledge that their Taxpayer Identification Numbers (Social Security Numbers or Employer Identification Numbers), which Corporate Defendants must submit to the Commission, may be used for collecting and reporting on any delinquent amount arising out of this Order, in accordance with 31 U.S.C. §7701.

G.      All money received by the Commission pursuant to this Order may be deposited into a fund administered by the Commission or its designee to be used for consumer relief, such as redress and any attendant expenses for the administration of any redress fund.   If a representative of the Commission decides that direct redress to consumers is wholly or partially impracticable or money remains after such redress is completed, the Commission may apply any remaining money for such related relief (including consumer information remedies) as it determines to be reasonably related to Defendants' practices alleged in the Complaint.   Any money not used for relief is to be deposited to the U.S. Treasury.   Corporate Defendants

have no right to challenge any actions the Commission or its representatives may take pursuant to this Subsection.

## VI. CUSTOMER INFORMATION

IT IS FURTHER ORDERED that Corporate Defendants are permanently restrained and enjoined from directly or indirectly:

A.     failing to provide sufficient customer information to enable the Commission to efficiently administer consumer redress.   Corporate Defendants represent that they have provided this redress information to the Commission.   If a representative of the Commission requests in writing any information related to redress, Corporate Defendants must provide it, in the form prescribed by the Commission, within 14 days; or

B.     disclosing, using, or benefitting from customer information that any Defendant obtained prior to entry of this Order, provided that the Corporate Defendants may use such information as needed for customers who opt to remain enrolled in any good or service through the Corporate Defendants, to effectuate customers' cancellation and refund requests, or to otherwise comply with the terms of this Order.   Such customer information includes the name, address, telephone number, email address, Social Security number, other identifying information, sensitive health information, or any data that enables access to a customer's account

Page 32 of 41

(including a credit card, bank account, or other financial account).

## VII. COOPERATION

IT IS FURTHER ORDERED that Corporate Defendants must fully cooperate with representatives of the Commission in this case and in any investigation related to or associated with the transactions or the occurrences that are the subject of the Complaint. Corporate Defendants must provide truthful and complete information, evidence, and testimony, and "must cause Defendants' officers, employees, representatives, or agents to appear" for interviews, discovery, hearings, trials, and any other proceedings that a Commission representative may reasonably request upon 5 days written notice, or other reasonable notice, at such places and times as a Commission representative may designate, without the service of a subpoena.

## VIII. ORDER ACKNOWLEDGMENTS

IT IS FURTHER ORDERED that Corporate Defendants obtain acknowledgments of receipt of this Order:

A.    Each Corporate Defendant, within 7 days of entry of this Order, must submit to the Commission an acknowledgment of receipt of this Order sworn under penalty of perjury.

B.    For 20 years after entry of this Order, each Corporate Defendant must deliver a copy of this Order to:    (1) all principals, officers, directors, and LLC

managers and members; (2) all employees having managerial responsibilities for conduct related to the subject matter of the Order and all agents and representatives who participate in conduct related to the subject matter of the Order; and (3) any business entity resulting from any change in structure as set forth in the Section titled Compliance Reporting. Delivery must occur within 7 days of entry of this Order for current personnel. For all others, delivery must occur before they assume their responsibilities.

C.      From each individual or entity to which a Defendant delivered a copy of this Order, that Defendant must obtain, within 30 days, a signed and dated acknowledgment of receipt of this Order.

## IX. COMPLIANCE REPORTING

IT IS FURTHER ORDERED that Corporate Defendants make timely submissions to the Commission:

A.      One year after entry of this Order, each Corporate Defendant must submit a compliance report, sworn under penalty of perjury:

1.      Each Corporate Defendant must:   (a) identify the primary physical, postal, and email address and telephone number, as designated points of contact, which representatives of the Commission may use to communicate with that Defendant; (b) identify all of that Defendant's businesses by all of their names,

Page 34 of 41

telephone numbers, and physical, postal, email, and Internet addresses; (c) describe the activities of each business, including the goods and services offered, the means of advertising, marketing, and sales, and the involvement of any other Defendant; (d) describe in detail whether and how that Defendant is in compliance with each Section of this Order; and (e) provide a copy of each Order Acknowledgment obtained pursuant to this Order, unless previously submitted to the Commission.

B.    For 20 years after entry of this Order, each Corporate Defendant must submit a compliance notice, sworn under penalty of perjury, within 14 days of any change in the following:

1.    Each Corporate Defendant must report any change in: (a) any designated point of contact; or (b) the structure of any Corporate Defendant or any entity that Defendant has any ownership interest in or controls directly or indirectly that may affect compliance obligations arising under this Order, including: creation, merger, sale, or dissolution of the entity or any subsidiary, parent, or affiliate that engages in any acts or practices subject to this Order.

C.    Each Corporate Defendant must submit to the Commission notice of the filing of any bankruptcy petition, insolvency proceeding, or similar proceeding by or against such Defendant within 14 days of its filing.

D.    Any submission to the Commission required by this Order to be sworn

under penalty of perjury must be true and accurate and comply with 28 U.S.C. § 1746, such as by concluding: "I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on: _____" and supplying the date, signatory's full name, title (if applicable), and signature.

E.      Unless otherwise directed by a Commission representative in writing, all submissions to the Commission pursuant to this Order must be emailed to DEbrief@ftc.gov or sent by overnight courier (not the U.S. Postal Service) to: Associate Director for Enforcement, Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue NW, Washington, DC 20580. The subject line must begin: FTC v. Benefytt Technologies, Inc., Matter No. 1923141.

## X. RECORDKEEPING

IT IS FURTHER ORDERED that Corporate Defendants must create certain records for 20 years after entry of the Order, and retain each such record for 5 years. Specifically, Corporate Defendants must create and retain the following records:

A.      accounting records showing the revenues from all goods or services sold;

B.      personnel records showing, for each person providing services, whether as an employee or otherwise, that person's: name; addresses; telephone

numbers; job title or position; dates of service; and (if applicable) the reason for termination;

C.      records of all consumer complaints concerning the subject matter of the Order and refund requests, whether received directly or indirectly, such as through a third party, and any response;

D.      all records necessary to demonstrate full compliance with each provision of this Order, including;

E.      for express, informed consent obtained in writing, documentation that shows such consent, including the date and the consumer's name, telephone number, and Billing Information;

F.      for express, informed consent obtained orally, an unedited voice recording that contains such consent, retrievable by date;

G.      all call recordings, logs, and electronic or paper correspondence, with consumers who contact Corporate Defendants as a result of receiving the Notification required by Section IV of this Order;

H.      copies of all material collected pursuant to Subsections II.B and II.D of this Order; and

I.      a copy of all advertisements or other marketing material related to any good or service sold.

## XI. COMPLIANCE MONITORING

IT IS FURTHER ORDERED that, for the purpose of monitoring Corporate Defendants' compliance with this Order and any failure to transfer any assets as required by this Order:

A.    Within 14 days of receipt of a written request from a representative of the Commission, each Corporate Defendant must:   submit additional compliance reports or other requested information, which must be sworn under penalty of perjury; appear for depositions; and produce documents for inspection and copying. The Commission is also authorized to obtain discovery, without further leave of court, using any of the procedures prescribed by Federal Rules of Civil Procedure 29, 30 (including telephonic depositions), 31, 33, 34, 36, 45, and 69.

B.    For matters concerning this Order, the Commission is authorized to communicate directly with each Corporate Defendant.   Corporate Defendants must permit representatives of the Commission to interview any employee or other person affiliated with any Corporate Defendant who has agreed to such an interview.   The person interviewed may have counsel present.

C.    The Commission may use all other lawful means, including posing, through its representatives as consumers, suppliers, or other individuals or entities, to Corporate Defendants or any individual or entity affiliated with Corporate

Page 38 of 41

Defendants, without the necessity of identification or prior notice.   Nothing in this Order limits the Commission's lawful use of compulsory process, pursuant to Sections 9 and 20 of the FTC Act, 15 U.S.C. §§ 49, 57b-1.

## XII. RETENTION OF JURISDICTION

IT IS FURTHER ORDERED that this Court retains jurisdiction of this matter for purposes of construction, modification, and enforcement of this Order.

SO ORDERED this ___11th___ day of ___August___, 2022.

_____

**UNITED STATES DISTRICT JUDGE**

Page 39 of 41

**SO STIPULATED AND AGREED:**

**FOR PLAINTIFF:**

/s/ *Matthew G. Schiltz*                         Date: 8/8/2022

Matthew G. Schiltz
Claire E. W. Stewart
Elizabeth C. Scott
Federal Trade Commission, Midwest Region
230 S. Dearborn Street, Suite 3030
Chicago, Illinois 60604
312.960.5619
mschiltz@ftc.gov; cstewart@ftc.gov; escott@ftc.gov
*Attorneys for Plaintiff*
*Federal Trade Commission*

**FOR CORPORATE DEFENDANTS:**

                         Date: 3/27/2022

Mark H. Hamer
William V. Roppolo
Teisha C. Johnson
Ashley Eickhof
Baker & McKenzie LLP
815 Connecticut Avenue, N.W.
Washington, DC 20006-4078
202.452.7077
mark.hamer@bakermckenzie.com
william.roppolo@bakermckenzie.com
teisha.johnson@bakermckenzie.com
ashley.eickhof@bakermckenzie.com
*Attorneys for Defendants Benefytt Technologies, Inc.,*
*Health Plan Intermediaries Holdings, LLC, and*
*HealthPocket, Inc.*

Page 40 of 41

**CORPORATE DEFENDANTS: Benefytt Technologies, Inc.,**
**Health Plan Intermediaries Holdings, LLC, and**
**HealthPocket, Inc.**


*Domenick C. DiCicco Jr.*

Date: 03.27.2022

**Domenick C. DiCicco Jr.,** as an
officer of Benefytt Technologies, Inc.


*Domenick C. DiCicco Jr.*

Date: 03.27.2022

**Domenick C. DiCicco Jr.,** as an
officer of Health Plan Intermediaries Holdings, LLC


*Domenick C. DiCicco Jr.*

Date: 03.27.2022

**Domenick C. DiCicco Jr.,** as an
officer of HealthPocket, Inc.

**Federal Trade Commission**                                            § 310.2

## PART 310—TELEMARKETING SALES RULE

Sec.
310.1  Scope of regulations in this part.
310.2  Definitions.
310.3  Deceptive telemarketing acts or practices.
310.4  Abusive telemarketing acts or practices.
310.5  Recordkeeping requirements.
310.6  Exemptions.
310.7  Actions by states and private persons.
310.8  Fee for access to the National Do Not Call Registry.
310.9  Severability.

AUTHORITY: 15 U.S.C. 6101–6108.

SOURCE: 75 FR 48516, Aug. 10, 2010, unless otherwise noted.

### § 310.1 Scope of regulations in this part.

This part implements the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. 6101-6108, as amended.

### § 310.2 Definitions.

(a) *Acquirer* means a business organization, financial institution, or an agent of a business organization or financial institution that has authority from an organization that operates or licenses a credit card system to authorize merchants to accept, transmit, or process payment by credit card through the credit card system for money, goods or services, or anything else of value.

385

APPENDIX A

**§310.2**                                             **16 CFR Ch. I (1–1–21 Edition)**

(b) *Attorney General* means the chief legal officer of a state.

(c) *Billing information* means any data that enables any person to access a customer's or donor's account, such as a credit card, checking, savings, share or similar account, utility bill, mortgage loan account, or debit card.

(d) *Caller identification service* means a service that allows a telephone subscriber to have the telephone number, and, where available, name of the calling party transmitted contemporaneously with the telephone call, and displayed on a device in or connected to the subscriber's telephone.

(e) *Cardholder* means a person to whom a credit card is issued or who is authorized to use a credit card on behalf of or in addition to the person to whom the credit card is issued.

(f) *Cash-to-cash money transfer* means the electronic (as defined in section 106(2) of the Electronic Signatures in Global and National Commerce Act (15 U.S.C. 7006(2)) transfer of the value of cash received from one person to another person in a different location that is sent by a money transfer provider and received in the form of cash. For purposes of this definition, *money transfer provider* means any person or financial institution that provides cash-to-cash money transfers for a person in the normal course of its business, whether or not the person holds an account with such person or financial institution. The term *cash-to-cash money transfer* includes a remittance transfer, as defined in section 919(g)(2) of the Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. 1693a, that is a cash-to-cash transaction; however it does not include any transaction that is:

(1) An electronic fund transfer as defined in section 903 of the EFTA;

(2) Covered by Regulation E, 12 CFR 1005.20, pertaining to gift cards; or

(3) Subject to the Truth in Lending Act, 15 U.S.C. 1601 *et seq.*

(g) *Cash reload mechanism* is a device, authorization code, personal identification number, or other security measure that makes it possible for a person to convert cash into an electronic (as defined in section 106(2) of the Electronic Signatures in Global and National Commerce Act (15 U.S.C. 7006(2)) form

that can be used to add funds to a general-use prepaid card, as defined in Regulation E, 12 CFR 1005.2, or an account with a payment intermediary. For purposes of this definition, a cash reload mechanism is not itself a general-use prepaid debit card or a swipe reload process or similar method in which funds are added directly onto a person's own general-use prepaid card or account with a payment intermediary.

(h) *Charitable contribution* means any donation or gift of money or any other thing of value.

(i) *Commission* means the Federal Trade Commission.

(j) *Credit* means the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment.

(k) *Credit card* means any card, plate, coupon book, or other credit device existing for the purpose of obtaining money, property, labor, or services on credit.

(l) *Credit card sales draft* means any record or evidence of a credit card transaction.

(m) *Credit card system* means any method or procedure used to process credit card transactions involving credit cards issued or licensed by the operator of that system.

(n) *Customer* means any person who is or may be required to pay for goods or services offered through telemarketing.

(o) *Debt relief service* means any program or service represented, directly or by implication, to renegotiate, settle, or in any way alter the terms of payment or other terms of the debt between a person and one or more unsecured creditors or debt collectors, including, but not limited to, a reduction in the balance, interest rate, or fees owed by a person to an unsecured creditor or debt collector.

(p) *Donor* means any person solicited to make a charitable contribution.

(q) *Established business relationship* means a relationship between a seller and a consumer based on:

(1) the consumer's purchase, rental, or lease of the seller's goods or services or a financial transaction between the

386

APPENDIX A

**Federal Trade Commission**

§ 310.2

consumer and seller, within the eighteen (18) months immediately preceding the date of a telemarketing call; or

(2) the consumer's inquiry or application regarding a product or service offered by the seller, within the three (3) months immediately preceding the date of a telemarketing call.

(r) *Free-to-pay conversion* means, in an offer or agreement to sell or provide any goods or services, a provision under which a customer receives a product or service for free for an initial period and will incur an obligation to pay for the product or service if he or she does not take affirmative action to cancel before the end of that period.

(s) *Investment opportunity* means anything, tangible or intangible, that is offered, offered for sale, sold, or traded based wholly or in part on representations, either express or implied, about past, present, or future income, profit, or appreciation.

(t) *Material* means likely to affect a person's choice of, or conduct regarding, goods or services or a charitable contribution.

(u) *Merchant* means a person who is authorized under a written contract with an acquirer to honor or accept credit cards, or to transmit or process for payment credit card payments, for the purchase of goods or services or a charitable contribution.

(v) *Merchant agreement* means a written contract between a merchant and an acquirer to honor or accept credit cards, or to transmit or process for payment credit card payments, for the purchase of goods or services or a charitable contribution.

(w) *Negative option feature* means, in an offer or agreement to sell or provide any goods or services, a provision under which the customer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer.

(x) *Outbound telephone call* means a telephone call initiated by a telemarketer to induce the purchase of goods or services or to solicit a charitable contribution.

(y) *Person* means any individual, group, unincorporated association, limited or general partnership, corporation, or other business entity.

(z) *Preacquired account information* means any information that enables a seller or telemarketer to cause a charge to be placed against a customer's or donor's account without obtaining the account number directly from the customer or donor during the telemarketing transaction pursuant to which the account will be charged.

(aa) *Prize* means anything offered, or purportedly offered, and given, or purportedly given, to a person by chance. For purposes of this definition, chance exists if a person is guaranteed to receive an item and, at the time of the offer or purported offer, the telemarketer does not identify the specific item that the person will receive.

(bb) *Prize promotion* means:

(1) A sweepstakes or other game of chance; or

(2) An oral or written express or implied representation that a person has won, has been selected to receive, or may be eligible to receive a prize or purported prize.

(cc) *Remotely created payment order* means any payment instruction or order drawn on a person's account that is created by the payee or the payee's agent and deposited into or cleared through the check clearing system. The term includes, without limitation, a "remotely created check," as defined in Regulation CC, Availability of Funds and Collection of Checks, 12 CFR 229.2(fff), but does not include a payment order cleared through an Automated Clearinghouse (ACH) Network or subject to the Truth in Lending Act, 15 U.S.C. 1601 *et seq.*, and Regulation Z, 12 CFR part 1026.

(dd) *Seller* means any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration.

(ee) *State* means any state of the United States, the District of Columbia, Puerto Rico, the Northern Mariana Islands, and any territory or possession of the United States.

(ff) *Telemarketer* means any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor.

(gg) *Telemarketing* means a plan, program, or campaign which is conducted

387

APPENDIX A

**§ 310.3**                                                    **16 CFR Ch. I (1–1–21 Edition)**

to induce the purchase of goods or services or a charitable contribution, by use of one or more telephones and which involves more than one interstate telephone call. The term does not include the solicitation of sales through the mailing of a catalog which: contains a written description or illustration of the goods or services offered for sale; includes the business address of the seller; includes multiple pages of written material or illustrations; and has been issued not less frequently than once a year, when the person making the solicitation does not solicit customers by telephone but only receives calls initiated by customers in response to the catalog and during those calls takes orders only without further solicitation. For purposes of the previous sentence, the term "further solicitation" does not include providing the customer with information about, or attempting to sell, any other item included in the same catalog which prompted the customer's call or in a substantially similar catalog.

(hh) *Upselling* means soliciting the purchase of goods or services following an initial transaction during a single telephone call. The upsell is a separate telemarketing transaction, not a continuation of the initial transaction. An "external upsell" is a solicitation made by or on behalf of a seller different from the seller in the initial transaction, regardless of whether the initial transaction and the subsequent solicitation are made by the same telemarketer. An "internal upsell" is a solicitation made by or on behalf of the same seller as in the initial transaction, regardless of whether the initial transaction and subsequent solicitation are made by the same telemarketer.

[75 FR 48516, Aug. 10, 2010, as amended at 80 FR 77557, Dec. 14, 2015]

**§ 310.3  Deceptive telemarketing acts or practices.**

(a) *Prohibited deceptive telemarketing acts or practices.* It is a deceptive telemarketing act or practice and a violation of this Rule for any seller or telemarketer to engage in the following conduct:

(1) Before a customer consents to pay [659] for goods or services offered, failing to disclose truthfully, in a clear and conspicuous manner, the following material information:

(i) The total costs to purchase, receive, or use, and the quantity of, any goods or services that are the subject of the sales offer; [660]

(ii) All material restrictions, limitations, or conditions to purchase, receive, or use the goods or services that are the subject of the sales offer;

(iii) If the seller has a policy of not making refunds, cancellations, exchanges, or repurchases, a statement informing the customer that this is the seller's policy; or, if the seller or telemarketer makes a representation about a refund, cancellation, exchange, or repurchase policy, a statement of all material terms and conditions of such policy;

(iv) In any prize promotion, the odds of being able to receive the prize, and, if the odds are not calculable in advance, the factors used in calculating the odds; that no purchase or payment is required to win a prize or to participate in a prize promotion and that any purchase or payment will not increase the person's chances of winning; and the no-purchase/no-payment method of participating in the prize promotion with either instructions on how to participate or an address or local or toll-free telephone number to which customers may write or call for information on how to participate;

---

[659] When a seller or telemarketer uses, or directs a customer to use, a courier to transport payment, the seller or telemarketer must make the disclosures required by § 310.3(a)(1) before sending a courier to pick up payment or authorization for payment, or directing a customer to have a courier pick up payment or authorization for payment. In the case of debt relief services, the seller or telemarketer must make the disclosures required by § 310.3(a)(1) before the consumer enrolls in an offered program.

[660] For offers of consumer credit products subject to the Truth in Lending Act, 15 U.S.C. 1601 *et seq.*, and Regulation Z, 12 CFR 226, compliance with the disclosure requirements under the Truth in Lending Act and Regulation Z shall constitute compliance with § 310.3(a)(1)(i) of this Rule.

388

APPENDIX A

**Federal Trade Commission**                                         §310.3

(v) All material costs or conditions to receive or redeem a prize that is the subject of the prize promotion;

(vi) In the sale of any goods or services represented to protect, insure, or otherwise limit a customer's liability in the event of unauthorized use of the customer's credit card, the limits on a cardholder's liability for unauthorized use of a credit card pursuant to 15 U.S.C. 1643;

(vii) If the offer includes a negative option feature, all material terms and conditions of the negative option feature, including, but not limited to, the fact that the customer's account will be charged unless the customer takes an affirmative action to avoid the charge(s), the date(s) the charge(s) will be submitted for payment, and the specific steps the customer must take to avoid the charge(s); and

(viii) In the sale of any debt relief service:

(A) the amount of time necessary to achieve the represented results, and to the extent that the service may include a settlement offer to any of the customer's creditors or debt collectors, the time by which the debt relief service provider will make a bona fide settlement offer to each of them;

(B) to the extent that the service may include a settlement offer to any of the customer's creditors or debt collectors, the amount of money or the percentage of each outstanding debt that the customer must accumulate before the debt relief service provider will make a bona fide settlement offer to each of them;

(C) to the extent that any aspect of the debt relief service relies upon or results in the customer's failure to make timely payments to creditors or debt collectors, that the use of the debt relief service will likely adversely affect the customer's creditworthiness, may result in the customer being subject to collections or sued by creditors or debt collectors, and may increase the amount of money the customer owes due to the accrual of fees and interest; and

(D) to the extent that the debt relief service requests or requires the customer to place funds in an account at an insured financial institution, that the customer owns the funds held in the account, the customer may withdraw from the debt relief service at any time without penalty, and, if the customer withdraws, the customer must receive all funds in the account, other than funds earned by the debt relief service in compliance with §310.4(a)(5)(i)(A) through (C).

(2) Misrepresenting, directly or by implication, in the sale of goods or services any of the following material information:

(i) The total costs to purchase, receive, or use, and the quantity of, any goods or services that are the subject of a sales offer;

(ii) Any material restriction, limitation, or condition to purchase, receive, or use goods or services that are the subject of a sales offer;

(iii) Any material aspect of the performance, efficacy, nature, or central characteristics of goods or services that are the subject of a sales offer;

(iv) Any material aspect of the nature or terms of the seller's refund, cancellation, exchange, or repurchase policies;

(v) Any material aspect of a prize promotion including, but not limited to, the odds of being able to receive a prize, the nature or value of a prize, or that a purchase or payment is required to win a prize or to participate in a prize promotion;

(vi) Any material aspect of an investment opportunity including, but not limited to, risk, liquidity, earnings potential, or profitability;

(vii) A seller's or telemarketer's affiliation with, or endorsement or sponsorship by, any person or government entity;

(viii) That any customer needs offered goods or services to provide protections a customer already has pursuant to 15 U.S.C. 1643;

(ix) Any material aspect of a negative option feature including, but not limited to, the fact that the customer's account will be charged unless the customer takes an affirmative action to avoid the charge(s), the date(s) the charge(s) will be submitted for payment, and the specific steps the customer must take to avoid the charge(s); or

389

APPENDIX A

§ 310.3                                    16 CFR Ch. I (1–1–21 Edition)

(x) Any material aspect of any debt relief service, including, but not limited to, the amount of money or the percentage of the debt amount that a customer may save by using such service; the amount of time necessary to achieve the represented results; the amount of money or the percentage of each outstanding debt that the customer must accumulate before the provider of the debt relief service will initiate attempts with the customer's creditors or debt collectors or make a bona fide offer to negotiate, settle, or modify the terms of the customer's debt; the effect of the service on a customer's creditworthiness; the effect of the service on collection efforts of the customer's creditors or debt collectors; the percentage or number of customers who attain the represented results; and whether a debt relief service is offered or provided by a non-profit entity.

(3) Causing billing information to be submitted for payment, or collecting or attempting to collect payment for goods or services or a charitable contribution, directly or indirectly, without the customer's or donor's express verifiable authorization, except when the method of payment used is a credit card subject to protections of the Truth in Lending Act and Regulation Z,[661] or a debit card subject to the protections of the Electronic Fund Transfer Act and Regulation E.[662] Such authorization shall be deemed verifiable if any of the following means is employed:

(i) Express written authorization by the customer or donor, which includes the customer's or donor's signature;[663]

(ii) Express oral authorization which is audio-recorded and made available upon request to the customer or donor, and the customer's or donor's bank or other billing entity, and which evidences clearly both the customer's or

donor's authorization of payment for the goods or services or charitable contribution that are the subject of the telemarketing transaction and the customer's or donor's receipt of all of the following information:

(A) An accurate description, clearly and conspicuously stated, of the goods or services or charitable contribution for which payment authorization is sought;

(B) The number of debits, charges, or payments (if more than one);

(C) The date(s) the debit(s), charge(s), or payment(s) will be submitted for payment;

(D) The amount(s) of the debit(s), charge(s), or payment(s);

(E) The customer's or donor's name;

(F) The customer's or donor's billing information, identified with sufficient specificity such that the customer or donor understands what account will be used to collect payment for the goods or services or charitable contribution that are the subject of the telemarketing transaction;

(G) A telephone number for customer or donor inquiry that is answered during normal business hours; and

(H) The date of the customer's or donor's oral authorization; or

(iii) Written confirmation of the transaction, identified in a clear and conspicuous manner as such on the outside of the envelope, sent to the customer or donor via first class mail prior to the submission for payment of the customer's or donor's billing information, and that includes all of the information contained in §§ 310.3(a)(3)(ii)(A)–(G) and a clear and conspicuous statement of the procedures by which the customer or donor can obtain a refund from the seller or telemarketer or charitable organization in the event the confirmation is inaccurate; provided, however, that this means of authorization shall not be deemed verifiable in instances in which goods or services are offered in a transaction involving a free-to-pay conversion and preacquired account information.

(4) Making a false or misleading statement to induce any person to pay for goods or services or to induce a charitable contribution.

---

[661] Truth in Lending Act, 15 U.S.C. 1601 *et seq.*, and Regulation Z, 12 CFR part 226.

[662] Electronic Fund Transfer Act, 15 U.S.C. 1693 *et seq.*, and Regulation E, 12 CFR part 205.

[663] For purposes of this Rule, the term "signature" shall include an electronic or digital form of signature, to the extent that such form of signature is recognized as a valid signature under applicable federal law or state contract law.

APPENDIX A

**Federal Trade Commission**                                          **§ 310.4**

(b) *Assisting and facilitating.* It is a deceptive telemarketing act or practice and a violation of this Rule for a person to provide substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice that violates §§ 310.3(a), (c) or (d), or § 310.4 of this Rule.

(c) *Credit card laundering.* Except as expressly permitted by the applicable credit card system, it is a deceptive telemarketing act or practice and a violation of this Rule for:

(1) A merchant to present to or deposit into, or cause another to present to or deposit into, the credit card system for payment, a credit card sales draft generated by a telemarketing transaction that is not the result of a telemarketing credit card transaction between the cardholder and the merchant;

(2) Any person to employ, solicit, or otherwise cause a merchant, or an employee, representative, or agent of the merchant, to present to or deposit into the credit card system for payment, a credit card sales draft generated by a telemarketing transaction that is not the result of a telemarketing credit card transaction between the cardholder and the merchant; or

(3) Any person to obtain access to the credit card system through the use of a business relationship or an affiliation with a merchant, when such access is not authorized by the merchant agreement or the applicable credit card system.

(d) *Prohibited deceptive acts or practices in the solicitation of charitable contributions.* It is a fraudulent charitable solicitation, a deceptive telemarketing act or practice, and a violation of this Rule for any telemarketer soliciting charitable contributions to misrepresent, directly or by implication, any of the following material information:

(1) The nature, purpose, or mission of any entity on behalf of which a charitable contribution is being requested;

(2) That any charitable contribution is tax deductible in whole or in part;

(3) The purpose for which any charitable contribution will be used;

(4) The percentage or amount of any charitable contribution that will go to

a charitable organization or to any particular charitable program;

(5) Any material aspect of a prize promotion including, but not limited to: the odds of being able to receive a prize; the nature or value of a prize; or that a charitable contribution is required to win a prize or to participate in a prize promotion; or

(6) A charitable organization's or telemarketer's affiliation with, or endorsement or sponsorship by, any person or government entity.

[75 FR 48516, Aug. 10, 2010, as amended at 80 FR 77558, Dec. 14, 2015]

§ 310.4  Abusive telemarketing acts or practices.

(a) *Abusive conduct generally.* It is an abusive telemarketing act or practice and a violation of this Rule for any seller or telemarketer to engage in the following conduct:

(1) Threats, intimidation, or the use of profane or obscene language;

(2) Requesting or receiving payment of any fee or consideration for goods or services represented to remove derogatory information from, or improve, a person's credit history, credit record, or credit rating until:

(i) The time frame in which the seller has represented all of the goods or services will be provided to that person has expired; and

(ii) The seller has provided the person with documentation in the form of a consumer report from a consumer reporting agency demonstrating that the promised results have been achieved, such report having been issued more than six months after the results were achieved. Nothing in this Rule should be construed to affect the requirement in the Fair Credit Reporting Act, 15 U.S.C. 1681, that a consumer report may only be obtained for a specified permissible purpose;

(3) Requesting or receiving payment of any fee or consideration from a person for goods or services represented to recover or otherwise assist in the return of money or any other item of value paid for by, or promised to, that person in a previous transaction, until seven (7) business days after such money or other item is delivered to that person. This provision shall not

391

APPENDIX A

§ 310.4                                   16 CFR Ch. I (1–1–21 Edition)

apply to goods or services provided to a person by a licensed attorney;

(4) Requesting or receiving payment of any fee or consideration in advance of obtaining a loan or other extension of credit when the seller or telemarketer has guaranteed or represented a high likelihood of success in obtaining or arranging a loan or other extension of credit for a person;

(5)(i) Requesting or receiving payment of any fee or consideration for any debt relief service until and unless:

(A) The seller or telemarketer has renegotiated, settled, reduced, or otherwise altered the terms of at least one debt pursuant to a settlement agreement, debt management plan, or other such valid contractual agreement executed by the customer;

(B) The customer has made at least one payment pursuant to that settlement agreement, debt management plan, or other valid contractual agreement between the customer and the creditor or debt collector; and

(C) To the extent that debts enrolled in a service are renegotiated, settled, reduced, or otherwise altered individually, the fee or consideration either:

(1) Bears the same proportional relationship to the total fee for renegotiating, settling, reducing, or altering the terms of the entire debt balance as the individual debt amount bears to the entire debt amount. The individual debt amount and the entire debt amount are those owed at the time the debt was enrolled in the service; or

(2) Is a percentage of the amount saved as a result of the renegotiation, settlement, reduction, or alteration. The percentage charged cannot change from one individual debt to another. The amount saved is the difference between the amount owed at the time the debt was enrolled in the service and the amount actually paid to satisfy the debt.

(ii) Nothing in § 310.4(a)(5)(i) prohibits requesting or requiring the customer to place funds in an account to be used for the debt relief provider's fees and for payments to creditors or debt collectors in connection with the renegotiation, settlement, reduction, or other alteration of the terms of payment or other terms of a debt, provided that:

(A) The funds are held in an account at an insured financial institution;

(B) The customer owns the funds held in the account and is paid accrued interest on the account, if any;

(C) The entity administering the account is not owned or controlled by, or in any way affiliated with, the debt relief service;

(D) The entity administering the account does not give or accept any money or other compensation in exchange for referrals of business involving the debt relief service; and

(E) The customer may withdraw from the debt relief service at any time without penalty, and must receive all funds in the account, other than funds earned by the debt relief service in compliance with § 310.4(a)(5)(i)(A) through (C), within seven (7) business days of the customer's request.

(6) Disclosing or receiving, for consideration, unencrypted consumer account numbers for use in telemarketing; provided, however, that this paragraph shall not apply to the disclosure or receipt of a customer's or donor's billing information to process a payment for goods or services or a charitable contribution pursuant to a transaction;

(7) Causing billing information to be submitted for payment, directly or indirectly, without the express informed consent of the customer or donor. In any telemarketing transaction, the seller or telemarketer must obtain the express informed consent of the customer or donor to be charged for the goods or services or charitable contribution and to be charged using the identified account. In any telemarketing transaction involving preacquired account information, the requirements in paragraphs (a)(7)(i) through (ii) of this section must be met to evidence express informed consent.

(i) In any telemarketing transaction involving preacquired account information and a free-to-pay conversion feature, the seller or telemarketer must:

(A) Obtain from the customer, at a minimum, the last four (4) digits of the account number to be charged;

(B) Obtain from the customer his or her express agreement to be charged for the goods or services and to be

392

APPENDIX A

**Federal Trade Commission**                                    **§310.4**

charged using the account number pursuant to paragraph (a)(7)(i)(A) of this section; and,

(C) Make and maintain an audio recording of the entire telemarketing transaction.

(ii) In any other telemarketing transaction involving preacquired account information not described in paragraph (a)(7)(i) of this section, the seller or telemarketer must:

(A) At a minimum, identify the account to be charged with sufficient specificity for the customer or donor to understand what account will be charged; and

(B) Obtain from the customer or donor his or her express agreement to be charged for the goods or services and to be charged using the account number identified pursuant to paragraph (a)(7)(ii)(A) of this section;

(8) Failing to transmit or cause to be transmitted the telephone number, and, when made available by the telemarketer's carrier, the name of the telemarketer, to any caller identification service in use by a recipient of a telemarketing call; provided that it shall not be a violation to substitute (for the name and phone number used in, or billed for, making the call) the name of the seller or charitable organization on behalf of which a telemarketing call is placed, and the seller's or charitable organization's customer or donor service telephone number, which is answered during regular business hours;

(9) Creating or causing to be created, directly or indirectly, a remotely created payment order as payment for goods or services offered or sold through telemarketing or as a charitable contribution solicited or sought through telemarketing; or

(10) Accepting from a customer or donor, directly or indirectly, a cash-to-cash money transfer or cash reload mechanism as payment for goods or services offered or sold through telemarketing or as a charitable contribution solicited or sought through telemarketing.

(b) *Pattern of calls.* (1) It is an abusive telemarketing act or practice and a violation of this Rule for a telemarketer to engage in, or for a seller

to cause a telemarketer to engage in, the following conduct:

(i) Causing any telephone to ring, or engaging any person in telephone conversation, repeatedly or continuously with intent to annoy, abuse, or harass any person at the called number;

(ii) Denying or interfering in any way, directly or indirectly, with a person's right to be placed on any registry of names and/or telephone numbers of persons who do not wish to receive outbound telephone calls established to comply with paragraph (b)(1)(iii)(A) of this section, including, but not limited to, harassing any person who makes such a request; hanging up on that person; failing to honor the request; requiring the person to listen to a sales pitch before accepting the request; assessing a charge or fee for honoring the request; requiring a person to call a different number to submit the request; and requiring the person to identify the seller making the call or on whose behalf the call is made;

(iii) Initiating any outbound telephone call to a person when:

(A) That person previously has stated that he or she does not wish to receive an outbound telephone call made by or on behalf of the seller whose goods or services are being offered or made on behalf of the charitable organization for which a charitable contribution is being solicited; or

(B) That person's telephone number is on the "do-not-call" registry, maintained by the Commission, of persons who do not wish to receive outbound telephone calls to induce the purchase of goods or services unless the seller or telemarketer:

(*1*) Can demonstrate that the seller has obtained the express agreement, in writing, of such person to place calls to that person. Such written agreement shall clearly evidence such person's authorization that calls made by or on behalf of a specific party may be placed to that person, and shall include the telephone number to which the calls may be placed and the signature[664] of that person; or

---

[664] For purposes of this Rule, the term "signature" shall include an electronic or digital form of signature, to the extent that such form of signature is recognized as a
*Continued*

393

APPENDIX A

(2) Can demonstrate that the seller has an established business relationship with such person, and that person has not stated that he or she does not wish to receive outbound telephone calls under paragraph (b)(1)(iii)(A) of this section; or

(iv) Abandoning any outbound telephone call. An outbound telephone call is "abandoned" under this section if a person answers it and the telemarketer does not connect the call to a sales representative within two (2) seconds of the person's completed greeting.

(v) Initiating any outbound telephone call that delivers a prerecorded message, other than a prerecorded message permitted for compliance with the call abandonment safe harbor in § 310.4(b)(4)(iii), unless:

(A) In any such call to induce the purchase of any good or service, the seller has obtained from the recipient of the call an express agreement, in writing, that:

(i) The seller obtained only after a clear and conspicuous disclosure that the purpose of the agreement is to authorize the seller to place prerecorded calls to such person;

(ii) The seller obtained without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service;

(iii) Evidences the willingness of the recipient of the call to receive calls that deliver prerecorded messages by or on behalf of a specific seller; and

(iv) Includes such person's telephone number and signature;[665] and

(B) In any such call to induce the purchase of any good or service, or to induce a charitable contribution from a member of, or previous donor to, a nonprofit charitable organization on whose behalf the call is made, the seller or telemarketer:

(i) Allows the telephone to ring for at least fifteen (15) seconds or four (4) rings before disconnecting an unanswered call; and

valid signature under applicable federal law or state contract law.

[665] For purposes of this Rule, the term "signature" shall include an electronic or digital form of signature, to the extent that such form of signature is recognized as a valid signature under applicable federal law or state contract law.

(ii) Within two (2) seconds after the completed greeting of the person called, plays a prerecorded message that promptly provides the disclosures required by § 310.4(d) or (e), followed immediately by a disclosure of one or both of the following:

(A) In the case of a call that could be answered in person by a consumer, that the person called can use an automated interactive voice and/or keypress-activated opt-out mechanism to assert a Do Not Call request pursuant to § 310.4(b)(1)(iii)(A) at any time during the message. The mechanism must:

(1) Automatically add the number called to the seller's entity-specific Do Not Call list;

(2) Once invoked, immediately disconnect the call; and

(3) Be available for use at any time during the message; and

(B) In the case of a call that could be answered by an answering machine or voicemail service, that the person called can use a toll-free telephone number to assert a Do Not Call request pursuant to § 310.4(b)(1)(iii)(A). The number provided must connect directly to an automated interactive voice or keypress-activated opt-out mechanism that:

(1) Automatically adds the number called to the seller's entity-specific Do Not Call list;

(2) Immediately thereafter disconnects the call; and

(3) Is accessible at any time throughout the duration of the telemarketing campaign; and

(iii) Complies with all other requirements of this part and other applicable federal and state laws.

(C) Any call that complies with all applicable requirements of this paragraph (v) shall not be deemed to violate § 310.4(b)(1)(iv) of this part.

(D) This paragraph (v) shall not apply to any outbound telephone call that delivers a prerecorded healthcare message made by, or on behalf of, a covered entity or its business associate, as those terms are defined in the HIPAA Privacy Rule, 45 CFR 160.103.

(2) It is an abusive telemarketing act or practice and a violation of this Rule for any person to sell, rent, lease, purchase, or use any list established to comply with § 310.4(b)(1)(iii)(A), or

**Federal Trade Commission**                                                    **§ 310.4**

maintained by the Commission pursuant to § 310.4(b)(1)(iii)(B), for any purpose except compliance with the provisions of this Rule or otherwise to prevent telephone calls to telephone numbers on such lists.

(3) A seller or telemarketer will not be liable for violating § 310.4(b)(1)(ii) and (iii) if it can demonstrate that, as part of the seller's or telemarketer's routine business practice:

(i) It has established and implemented written procedures to comply with § 310.4(b)(1)(ii) and (iii);

(ii) It has trained its personnel, and any entity assisting in its compliance, in the procedures established pursuant to § 310.4(b)(3)(i);

(iii) The seller, or a telemarketer or another person acting on behalf of the seller or charitable organization, has maintained and recorded a list of telephone numbers the seller or charitable organization may not contact, in compliance with § 310.4(b)(1)(iii)(A);

(iv) The seller or a telemarketer uses a process to prevent telemarketing to any telephone number on any list established pursuant to § 310.4(b)(3)(iii) or 310.4(b)(1)(iii)(B), employing a version of the "do-not-call" registry obtained from the Commission no more than thirty-one (31) days prior to the date any call is made, and maintains records documenting this process;

(v) The seller or a telemarketer or another person acting on behalf of the seller or charitable organization, monitors and enforces compliance with the procedures established pursuant to § 310.4(b)(3)(i); and

(vi) Any subsequent call otherwise violating paragraph (b)(1)(ii) or (iii) of this section is the result of error and not of failure to obtain any information necessary to comply with a request pursuant to paragraph (b)(1)(iii)(A) of this section not to receive further calls by or on behalf of a seller or charitable organization.

(4) A seller or telemarketer will not be liable for violating § 310.4(b)(1)(iv) if:

(i) The seller or telemarketer employs technology that ensures abandonment of no more than three (3) percent of all calls answered by a person, measured over the duration of a single calling campaign, if less than 30 days, or separately over each successive 30-

day period or portion thereof that the campaign continues.

(ii) The seller or telemarketer, for each telemarketing call placed, allows the telephone to ring for at least fifteen (15) seconds or four (4) rings before disconnecting an unanswered call;

(iii) Whenever a sales representative is not available to speak with the person answering the call within two (2) seconds after the person's completed greeting, the seller or telemarketer promptly plays a recorded message that states the name and telephone number of the seller on whose behalf the call was placed[666]; and

(iv) The seller or telemarketer, in accordance with § 310.5(b)-(d), retains records establishing compliance with § 310.4(b)(4)(i)-(iii).

(c) *Calling time restrictions.* Without the prior consent of a person, it is an abusive telemarketing act or practice and a violation of this Rule for a telemarketer to engage in outbound telephone calls to a person's residence at any time other than between 8:00 a.m. and 9:00 p.m. local time at the called person's location.

(d) *Required oral disclosures in the sale of goods or services.* It is an abusive telemarketing act or practice and a violation of this Rule for a telemarketer in an outbound telephone call or internal or external upsell to induce the purchase of goods or services to fail to disclose truthfully, promptly, and in a clear and conspicuous manner to the person receiving the call, the following information:

(1) The identity of the seller;

(2) That the purpose of the call is to sell goods or services;

(3) The nature of the goods or services; and

(4) That no purchase or payment is necessary to be able to win a prize or participate in a prize promotion if a prize promotion is offered and that any purchase or payment will not increase the person's chances of winning. This disclosure must be made before or in conjunction with the description of the prize to the person called. If requested

---

[666] This provision does not affect any seller's or telemarketer's obligation to comply with relevant state and federal laws, including but not limited to the TCPA, 47 U.S.C. 227, and 47 CFR part 64.1200.

395

APPENDIX A

**§310.5**                                                  **16 CFR Ch. I (1–1–21 Edition)**

by that person, the telemarketer must disclose the no-purchase/no-payment entry method for the prize promotion; provided, however, that, in any internal upsell for the sale of goods or services, the seller or telemarketer must provide the disclosures listed in this section only to the extent that the information in the upsell differs from the disclosures provided in the initial telemarketing transaction.

(e) *Required oral disclosures in charitable solicitations.* It is an abusive telemarketing act or practice and a violation of this Rule for a telemarketer, in an outbound telephone call to induce a charitable contribution, to fail to disclose truthfully, promptly, and in a clear and conspicuous manner to the person receiving the call, the following information:

(1) The identity of the charitable organization on behalf of which the request is being made; and

(2) That the purpose of the call is to solicit a charitable contribution.

[75 FR 48516, Aug. 10, 2010, as amended at 76 FR 58716, Sept. 22, 2011; 80 FR 77559, Dec. 14, 2015]

**§310.5  Recordkeeping requirements.**

(a) Any seller or telemarketer shall keep, for a period of 24 months from the date the record is produced, the following records relating to its telemarketing activities:

(1) All substantially different advertising, brochures, telemarketing scripts, and promotional materials;

(2) The name and last known address of each prize recipient and the prize awarded for prizes that are represented, directly or by implication, to have a value of $25.00 or more;

(3) The name and last known address of each customer, the goods or services purchased, the date such goods or services were shipped or provided, and the amount paid by the customer for the goods or services;[667]

(4) The name, any fictitious name used, the last known home address and

[667] For offers of consumer credit products subject to the Truth in Lending Act, 15 U.S.C. 1601 *et seq.*, and Regulation Z, 12 CFR 226, compliance with the recordkeeping requirements under the Truth in Lending Act, and Regulation Z, shall constitute compliance with §310.5(a)(3) of this Rule.

telephone number, and the job title(s) for all current and former employees directly involved in telephone sales or solicitations; provided, however, that if the seller or telemarketer permits fictitious names to be used by employees, each fictitious name must be traceable to only one specific employee; and

(5) All verifiable authorizations or records of express informed consent or express agreement required to be provided or received under this Rule.

(b) A seller or telemarketer may keep the records required by §310.5(a) in any form, and in the same manner, format, or place as they keep such records in the ordinary course of business. Failure to keep all records required by §310.5(a) shall be a violation of this Rule.

(c) The seller and the telemarketer calling on behalf of the seller may, by written agreement, allocate responsibility between themselves for the recordkeeping required by this Section. When a seller and telemarketer have entered into such an agreement, the terms of that agreement shall govern, and the seller or telemarketer, as the case may be, need not keep records that duplicate those of the other. If the agreement is unclear as to who must maintain any required record(s), or if no such agreement exists, the seller shall be responsible for complying with §§310.5(a)(1)-(3) and (5); the telemarketer shall be responsible for complying with §310.5(a)(4).

(d) In the event of any dissolution or termination of the seller's or telemarketer's business, the principal of that seller or telemarketer shall maintain all records as required under this section. In the event of any sale, assignment, or other change in ownership of the seller's or telemarketer's business, the successor business shall maintain all records required under this section.

**§310.6  Exemptions.**

(a) Solicitations to induce charitable contributions via outbound telephone calls are not covered by §310.4(b)(1)(iii)(B) of this Rule.

(b) The following acts or practices are exempt from this Rule:

APPENDIX A

**Federal Trade Commission**                                             **§ 310.7**

(1) The sale of pay-per-call services subject to the Commission's Rule entitled "Trade Regulation Rule Pursuant to the Telephone Disclosure and Dispute Resolution Act of 1992," 16 CFR part 308, *provided*, however, that this exemption does not apply to the requirements of §§ 310.4(a)(1), (a)(7), (b), and (c);

(2) The sale of franchises subject to the Commission's Rule entitled "Disclosure Requirements and Prohibitions Concerning Franchising," ("Franchise Rule") 16 CFR part 436, and the sale of business opportunities subject to the Commission's Rule entitled "Disclosure Requirements and Prohibitions Concerning Business Opportunities," ("Business Opportunity Rule") 16 CFR part 437, *provided*, however, that this exemption does not apply to the requirements of §§ 310.4(a)(1), (a)(7), (b), and (c);

(3) Telephone calls in which the sale of goods or services or charitable solicitation is not completed, and payment or authorization of payment is not required, until after a face-to-face sales or donation presentation by the seller or charitable organization, *provided*, however, that this exemption does not apply to the requirements of §§ 310.4(a)(1), (a)(7), (b), and (c);

(4) Telephone calls initiated by a customer or donor that are not the result of any solicitation by a seller, charitable organization, or telemarketer, *provided*, however, that this exemption does not apply to any instances of upselling included in such telephone calls;

(5) Telephone calls initiated by a customer or donor in response to an advertisement through any medium, other than direct mail solicitation, *provided*, however, that this exemption does not apply to:

(i) Calls initiated by a customer or donor in response to an advertisement relating to investment opportunities, debt relief services, business opportunities other than business arrangements covered by the Franchise Rule or Business Opportunity Rule, or advertisements involving offers for goods or services described in § 310.3(a)(1)(vi) or § 310.4(a)(2) through (4);

(ii) The requirements of § 310.4(a)(9) or (10); or

(iii) Any instances of upselling included in such telephone calls;

(6) Telephone calls initiated by a customer or donor in response to a direct mail solicitation, including solicitations via the U.S. Postal Service, facsimile transmission, electronic mail, and other similar methods of delivery in which a solicitation is directed to specific address(es) or person(s), that clearly, conspicuously, and truthfully discloses all material information listed in § 310.3(a)(1), for any goods or services offered in the direct mail solicitation, and that contains no material misrepresentation regarding any item contained in § 310.3(d) for any requested charitable contribution; *provided*, however, that this exemption does not apply to:

(i) Calls initiated by a customer in response to a direct mail solicitation relating to prize promotions, investment opportunities, debt relief services, business opportunities other than business arrangements covered by the Franchise Rule or Business Opportunity Rule, or goods or services described in § 310.3(a)(1)(vi) or § 310.4(a)(2) through (4);

(ii) The requirements of § 310.4(a)(9) or (10); or

(iii) Any instances of upselling included in such telephone calls; and

(7) Telephone calls between a telemarketer and any business to induce the purchase of goods or services or a charitable contribution by the business, except calls to induce the retail sale of nondurable office or cleaning supplies; *provided*, however, that §§ 310.4(b)(1)(iii)(B) and 310.5 shall not apply to sellers or telemarketers of nondurable office or cleaning supplies.

[75 FR 48516, Aug. 10, 2010, as amended at 80 FR 77559, Dec. 14, 2015]

**§ 310.7  Actions by states and private persons.**

(a) Any attorney general or other officer of a state authorized by the state to bring an action under the Telemarketing and Consumer Fraud and Abuse Prevention Act, and any private person who brings an action under that Act, shall serve written notice of its action on the Commission, if feasible, prior to its initiating an action under this Rule. The notice shall be sent to

397

APPENDIX A

§310.8                                      **16 CFR Ch. I (1–1–21 Edition)**

the Office of the Director, Bureau of Consumer Protection, Federal Trade Commission, Washington, DC 20580, and shall include a copy of the state's or private person's complaint and any other pleadings to be filed with the court. If prior notice is not feasible, the state or private person shall serve the Commission with the required notice immediately upon instituting its action.

(b) Nothing contained in this Section shall prohibit any attorney general or other authorized state official from proceeding in state court on the basis of an alleged violation of any civil or criminal statute of such state.

**§310.8  Fee for access to the National Do Not Call Registry.**

(a) It is a violation of this Rule for any seller to initiate, or cause any telemarketer to initiate, an outbound telephone call to any person whose telephone number is within a given area code unless such seller, either directly or through another person, first has paid the annual fee, required by §310.8(c), for access to telephone numbers within that area code that are included in the National Do Not Call Registry maintained by the Commission under §310.4(b)(1)(iii)(B); provided, however, that such payment is not necessary if the seller initiates, or causes a telemarketer to initiate, calls solely to persons pursuant to §§310.4(b)(1)(iii)(B)(i) or (ii), and the seller does not access the National Do Not Call Registry for any other purpose.

(b) It is a violation of this Rule for any telemarketer, on behalf of any seller, to initiate an outbound telephone call to any person whose telephone number is within a given area code unless that seller, either directly or through another person, first has paid the annual fee, required by §310.8(c), for access to the telephone numbers within that area code that are included in the National Do Not Call Registry; provided, however, that such payment is not necessary if the seller initiates, or causes a telemarketer to initiate, calls solely to persons pursuant to §§310.4(b)(1)(iii)(B)(i) or (ii), and the seller does not access the National Do

Not Call Registry for any other purpose.

(c) The annual fee, which must be paid by any person prior to obtaining access to the National Do Not Call Registry, is $66 for each area code of data accessed, up to a maximum of $18,044; *provided*, however, that there shall be no charge to any person for accessing the first five area codes of data, and *provided further*, that there shall be no charge to any person engaging in or causing others to engage in outbound telephone calls to consumers and who is accessing area codes of data in the National Do Not Call Registry if the person is permitted to access, but is not required to access, the National Do Not Call Registry under this Rule, 47 CFR 64.1200, or any other Federal regulation or law. No person may participate in any arrangement to share the cost of accessing the National Do Not Call Registry, including any arrangement with any telemarketer or service provider to divide the costs to access the registry among various clients of that telemarketer or service provider.

(d) Each person who pays, either directly or through another person, the annual fee set forth in paragraph (c) of this section, each person excepted under paragraph (c) from paying the annual fee, and each person excepted from paying an annual fee under §310.4(b)(1)(iii)(B), will be provided a unique account number that will allow that person to access the registry data for the selected area codes at any time for the twelve month period beginning on the first day of the month in which the person paid the fee ("the annual period"). To obtain access to additional area codes of data during the first six months of the annual period, each person required to pay the fee under paragraph (c) of this section must first pay $66 for each additional area code of data not initially selected. To obtain access to additional area codes of data during the second six months of the annual period, each person required to pay the fee under paragraph (c) of this section must first pay $33 for each additional area code of data not initially selected. The payment of the additional fee will permit the person to access the additional area codes of data for the remainder of the annual period.

398

APPENDIX A

**Federal Trade Commission**  §311.3

(e) Access to the National Do Not Call Registry is limited to telemarketers, sellers, others engaged in or causing others to engage in telephone calls to consumers, service providers acting on behalf of such persons, and any government agency that has law enforcement authority. Prior to accessing the National Do Not Call Registry, a person must provide the identifying information required by the operator of the registry to collect the fee, and must certify, under penalty of law, that the person is accessing the registry solely to comply with the provisions of this Rule or to otherwise prevent telephone calls to telephone numbers on the registry. If the person is accessing the registry on behalf of sellers, that person also must identify each of the sellers on whose behalf it is accessing the registry, must provide each seller's unique account number for access to the national registry, and must certify, under penalty of law, that the sellers will be using the information gathered from the registry solely to comply with the provisions of this Rule or otherwise to prevent telephone calls to telephone numbers on the registry.

[75 FR 48516, Aug. 10, 2010; 75 FR 51934, Aug. 24, 2010, as amended at 77 FR 51697, Aug. 27, 2012; 78 FR 53643, Aug. 30, 2013; 79 FR 51478, Aug. 29, 2014; 80 FR 77560, Dec. 14, 2016; 81 FR 59845, Aug. 31, 2016; 82 FR 39534, Aug. 21, 2017; 83 FR 46640, Sept. 14, 2018; 84 FR 44687, Aug. 27, 2019; 85 FR 62597, Oct. 5, 2020]

§310.9  Severability.

The provisions of this Rule are separate and severable from one another. If any provision is stayed or determined to be invalid, it is the Commission's intention that the remaining provisions shall continue in effect.

399

APPENDIX A

## NOTICE TO BENEFYTT CUSTOMERS

**FROM:** support@mybk.com

**EMAIL SUBJECT LINE:** Settlement of Federal Trade Commission Lawsuit against Benefytt. Decision required.

**EMAIL PREVIEW TEXT:** You have the opportunity to enroll in the Health Insurance Marketplace® because of this settlement.

**TEXT:**

Dear [customer's full name]:

Our records show you're paying for [name at least one Benefytt product the consumer will recognize, followed by "and other products" wherever applicable, which you bought from [name of Benefytt company/affiliate the consumer will recognize]. You were billed for these products by Benefytt or MyBenefitsKeeper, which is a name used by Benefytt.

**The Federal Trade Commission (FTC), the nation's consumer protection agency, sued us, claiming that we deceived our customers,** and we agreed to settle the lawsuit. The lawsuit says that many of the healthcare products we sell don't cover people's medical needs, and that we've charged consumers for things they didn't agree to buy.

That means:

- **You may have to pay almost all your medical bills** if you get sick or have to go to the hospital.
- **You may be paying for products you didn't agree to buy.**

You are making monthly payments for the following products:

*[Insert chart tailored to each customer, starting with short-term and/or limited medical plan, with corresponding charge, frequency, and duration for each product, as shown in the following example:*

| Product: | You pay: | You'll keep getting billed: |
|---|---|---|
| [name of short-term medical plan] | $119.12 per month | Until [date], unless you cancel |
| [name of dental discount plan] | $40.00 per month | Automatically until you cancel |
| [name of accident plan] | $67.40 per month | Automatically until you cancel |
| [name of assoc. membership] | $19.99 per month | Automatically until you cancel |
| [name of telemedicine plan] | $19.99 per month | Automatically until you cancel |
| | **Total Monthly Charges: $266.50** | |

*]*

## APPENDIX B

## Can I cancel the products I'm paying for?

**Yes. Visit Here [hyperlink] or call 855-476-6009 as soon as possible to cancel your coverage.** You can cancel some or all of the products you have. We'll cancel your coverage and stop billing you immediately. If you select this option, your coverage will end the same day. If your last monthly payment was before [date of order entry], we will partially refund that payment based on the date you cancel. If you made any monthly payments after [date of order entry] and cancel by [date certain – 105 days from order entry], we'll refund all charges you paid since [date of order entry].

**If you want to keep your current products, you don't have to do anything.** We'll keep billing you for the products you have. **Important:** You might not have comprehensive health insurance, so you may have to pay almost all your medical bills if you get sick or have to go to the hospital.

## You have a Special Enrollment Period to get comprehensive health coverage through HealthCare.gov, the federal Health Insurance Marketplace®.

**This special opportunity ends [SEP end date – 65 days from notice mail date].** Take action now to reduce any gap in your health coverage until your Marketplace coverage starts.

When you apply for the Marketplace, they will check if you qualify for lower premiums and other costs, or for free or low-cost coverage through Medicaid or the Children's Health Insurance Program (CHIP), based on your income.

### Steps to get Marketplace coverage:

1. **Visit HealthCare.gov/get-coverage. Select your state to create an account and fill out an application.** Use your MyBenefitsKeeper member email address when creating your Marketplace account.

   **NOTE:** Ignore a message if it says that you aren't eligible to enroll in a plan because the Open Enrollment Period for 2022 ended. Because of your situation, you're still able to enroll now.

2. **Within 1-2 days, the Marketplace will process your application and send you a notice about your eligibility with directions on how to get coverage during the Special Enrollment Period.** You'll have 60 days to select a plan through HealthCare.gov.

   **NOTE:** The notice about your eligibility will be available in your Marketplace account. Depending on what you picked for communication preferences, you may

APPENDIX B

also get an email alert, or get a copy in the mail.

3. **Log into your Marketplace account.** Return to your Marketplace application to select a new plan for 2022 health coverage.

## Need help enrolling in the Marketplace?

Call the Marketplace Call Center at 1-800-318-2596. TTY users can call 1-855-889-4325.

- Be sure to say that you're a "Benefytt" customer who bought a plan that's covered by the settlement agreement. Mention the "Federal Trade Commission" or "FTC" case against Benefytt.
- Share with us the email address and phone number you used when you first signed up for your Benefytt plan.

MyBenefitsKepper (Benefytt) shared this information with the Marketplace, so they know who you are and can confirm that you qualify for this Special Enrollment Period.

## When will my Marketplace coverage begin?

Your Marketplace coverage will start the month after you select a plan through HealthCare.gov. You can also request an earlier coverage start date by calling the Marketplace Call Center.

## For more help:

- For questions about the Marketplace, visit HealthCare.gov, or call the Marketplace Call Center at 1-800-318-2596. TTY users can call 1-855-889-4325. You can also make an appointment with someone in your area who can help you. Information is available at LocalHelp.HealthCare.gov.
- Call the Marketplace Call Center to get this information in an accessible format, like large print, Braille, or audio, at no cost to you.

Visit ftc.gov/[insert] for more information about the FTC's lawsuit against Benefytt.

Sincerely,


Todd Baxter
Chief Executive Officer, Benefytt

## APPENDIX B

## NOTICE TO BENEFYTT CUSTOMERS

**FROM:** support@mybk.com

**EMAIL SUBJECT LINE:** Settlement of Federal Trade Commission Lawsuit against Benefytt. Decision required.

**EMAIL PREVIEW TEXT:** You have the opportunity to enroll in your state's health insurance marketplace because of this settlement.

**TEXT:**

Dear [customer's full name]:

Our records show you're paying for [name at least one Benefytt product the consumer will recognize, followed by "and other products" wherever applicable, which you bought from [name of Benefytt company/affiliate the consumer will recognize]. You were billed for these products by Benefytt or MyBenefitsKeeper, which is a name used by Benefytt.

**The Federal Trade Commission (FTC), the nation's consumer protection agency, sued us, claiming that we deceived our customers,** and we agreed to settle the lawsuit. The lawsuit says that many of the healthcare products we sell don't cover people's medical needs, and that we've charged consumers for things they didn't agree to buy.

That means:

- **You may have to pay almost all your medical bills** if you get sick or have to go to the hospital.
- **You may be paying for products you didn't agree to buy.**

You are making monthly payments for the following products:

*[Insert chart tailored to each customer, starting with short-term and/or limited medical plan, with corresponding charge, frequency, and duration for each product, as shown in the following example:*

| Product: | You pay: | You'll keep getting billed: |
|---|---|---|
| [name of short-term medical plan] | **$119.12 per month** | Until [date], unless you cancel |
| [name of dental discount plan] | **$40.00 per month** | Automatically until you cancel |
| [name of accident plan] | **$67.40 per month** | Automatically until you cancel |
| [name of assoc. membership] | **$19.99 per month** | Automatically until you cancel |
| [name of telemedicine plan] | **$19.99 per month** | Automatically until you cancel |
| | **Total Monthly Charges: $266.50** | |

*]*

## APPENDIX B

## Can I cancel the products I'm paying for?

**Yes. Visit <u>Here [hyperlink]</u> or call 855-476-6009 as soon as possible to cancel your coverage.** You can cancel some or all of the products you have. We'll cancel your coverage and stop billing you immediately. If you select this option, your coverage will end the same day. If your last monthly payment was before [date of order entry], we will partially refund that payment based on the date you cancel. If you made any monthly payments after [date of order entry] and cancel by [date certain – 105 days from order entry], we'll refund all charges you paid since [date of order entry].

**If you want to keep your current products, you don't have to do anything.** We'll keep billing you for the products you have. **Important:** You might not have comprehensive health insurance, so you may have to pay almost all your medical bills if you get sick or have to go to the hospital.

*[Insert if member lives in CA, CO, CT, DC, ID, KY, MA, ME, MD, MN, NJ, NV, NM, NY, PA, RI, VT, or WA:]*

## How do I get comprehensive health coverage?

You may be able to get health coverage through your state's health insurance marketplace. They'll let you know if you qualify for a Special Enrollment Period through the [state] marketplace and how to apply.

Get more details about buying a comprehensive health insurance plan:

- **Call your state's marketplace Call Center** at [insert consumer's state's exchange phone number]. TTY users can call [insert state's exchange TTY number].
- You can tell them you're a "Benefytt" customer who bought a plan that's covered by the settlement agreement. You may have to send this notice to them.

Visit ftc.gov/[insert] for more information about the FTC's lawsuit against Benefytt.

Sincerely,


Todd Baxter
Chief Executive Officer, Benefytt


APPENDIX B